923 P.2d 1131

STATE of New Mexico,
Plaintiff–Appellee,

v.

Christopher ROTHERHAM,
Defendant–Appellant.

STATE of New Mexico,
Plaintiff–Appellee,

v.

Richard LOPEZ, Defendant–Appellant.

STATE of New Mexico,
Plaintiff–Appellee,

v.

Lucille EPPERSON, Defendant–
Appellant.

STATE of New Mexico, Plaintiff–
Appellant,

v.

Joe MARTINEZ, a/k/a Primitivo
Ortega, Defendant–Appellee.

STATE of New Mexico,
Plaintiff–Appellee,

v.

Charles Henry LUCAS, Defendant–
Appellant.

Nos. 22059, 22462, 22497, 22608 and 22650.

Supreme Court of New Mexico.

May 31, 1996.

Rehearing Denied Aug. 20, 1996.

T. Glenn Ellington, Chief Public Defender, Hollis Ann Whitson, Mental Health Unit Coordinator, Laurie A. Knight, Kari Converse, Assistant Public Defenders, Santa Fe, for Defendant–Appellant in No. 22059.

Tom Udall, Attorney General, Gail Mac-Questen, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee in Nos. 22,059, 22,-497 and 22,608.

Barbara E. Bergman, James W. Ellis, Albuquerque, for Amicus Curiae NMCCD in Nos. 22,059, 22,497 and 22,608.

Jones, Snead, Wertheim, Wentworth & Jaramillo, P.A., Jerry Todd Wertheim, Santa Fe, Ronald S. Honberg, Arlington, VA, for Amici Curiae NAMI & AMINM in No. 22,-059 and 22,650.

Nancy Koenigsberg, Protection and Advocacy System, Albuquerque, for Amici Curiae NMPAS, NAPAS & ARC in Nos. 22,059, 22,462 and 22,608.

Adam G. Kurtz, Albuquerque, Lawrence J. Fleming, St. Louis, MO, Richard A. Winterbottom, Albuquerque, for Amici Curiae NACDL & NMCDLA in Nos. 22,059, 22,462, 22,497 and 22,650.

T. Glenn Ellington, Chief Public Defender, Hollis Ann Whitson, Mental Health Unit Coordinator, Laurie A. Knight, Assistant Public Defender, Ralph Odenwald, Second Judicial District Defender, Santa Fe, for Defendant–Appellant in No. 22,462.

Tom Udall, Attorney General, Joel Jacobsen, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee in No. 22,462.

T. Glenn Ellington, Chief Public Defender, Hollis A. Whitson, Mental Health Unit Coordinator, Laurie A. Knight, Assistant Public

Defender, Santa Fe, for Defendant–Appellant in No. 22,497.

T. Glenn Ellington, Chief Public Defender, Hollis Ann Whitson, Mental Health Unit Coordinator, Laurie A. Knight, Assistant Public Defender, John L. Walker, Metropolitan Court Supervisor, Santa Fe, for Plaintiff–Appellee in No. 22,608.

Tom Udall, Attorney General, Jennifer Stone, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee in No. 22,650.

## OPINION

BACA, Justice.

At issue on appeal is the constitutionality of New Mexico's Mental Illness and Competency Code, NMSA1978, §§ 31–9–1 to –1.5 (Cum.Supp.1995) (hereinafter "the NMMIC"), which provides the procedure to be followed in cases where a criminal defendant is incompetent to stand trial. Appellants, Christopher Rotherham, Lucille Epperson, Richard Lopez, and Charles Lucas, are criminal defendants who are incompetent to stand trial. On appeal, they contend that the NMMIC is unconstitutional. Appellant, the State of New Mexico, appealing the dismissal of criminal commitment proceedings under Section 31–9–1.5 of the NMMIC against Joe Martinez (a/k/a Primitivo Ortega), also an incompetent criminal defendant, contends that the NMMIC is constitutional. We address the following issues: (1) whether the NMMIC deprives an incompetent criminal defendant of equal protection under the law; (2) whether the NMMIC deprives an incompetent defendant of substantive due process; and (3) whether the NMMIC deprives an incompetent criminal defendant of procedural due process. All five Appellants present identical constitutional issues, thus we deem their respective appeals proper for consolidation.[1] We note jurisdiction under NMSA1978, Section 34–5–14(C)(1) (Repl. Pamp.1990) (providing that Supreme Court has appellate jurisdiction in matters certified

from Court of Appeals that involve significant questions of law under constitution of New Mexico or United States), and we hold the NMMIC to be constitutional.

## I.

### A.

On June 13, 1989, Christopher Rotherham was indicted on charges of first-degree murder, second-degree murder, or manslaughter. The district court found Rotherham to be incompetent to stand trial on the charges and committed him to the Las Vegas Medical Center–Forensic Treatment Unit ("the LVMC–FTU") for treatment to attain competency to stand trial. The court ordered the hospital to file a report within 30 days assessing, among other items, the specific cause of Rotherham's disability and amenability to treatment to competency. The court set a hearing for September 18, 1989, to review Rotherham's competency. Over the next three years, the LVMC–FTU staff sent reports indicating that Rotherham was not competent to stand trial. On January 27, 1992, the LVMC–FTU staff indicated that he was not likely to attain competency to stand trial within a year. On April 27, 1992, the State filed a motion to determine Rotherham's competency and dangerousness. At the hearing on the motion held on August 3, 1992, the State and counsel for Rotherham agreed that he was incompetent to stand trial. The court heard expert testimony that it was unlikely Rotherham would become competent to stand trial. The expert further testified that if Rotherham were allowed to live independently without treatment and without a staff to administer his medication, he would likely cause great bodily harm to himself or to other people. A hospital staff psychiatrist who treated Rotherham testified that he observed Rotherham exhibit behavior that was "very close to physical violence."

---

1. Each of the five incompetent criminal defendants in this consolidated appeal is presently at varying stages in the statutory procedure. Accordingly, the State effectively contends that defendants have no standing to challenge the particular sections of the statute that as yet have not been applied to their case. We acknowledge the

State's contention. Nonetheless, because of today's holding, we deem it unnecessary to address issues regarding standing. Additionally, for clarity, we address each issue as being applicable to each Appellant, including Appellee, Mr. Martinez.

On August 7, 1992, the court entered an order, finding beyond a reasonable doubt that Rotherham was dangerous and that, if released, he would pose a danger to himself or the community.

On August 18, 1993, the State filed a motion to pursue criminal commitment pursuant to Section 31–9–1.4(A) and Section 31–9–1.5 and, on April 6, 1994, the district court granted that motion. Rotherham appealed to this Court before the district court proceeded under Section 31–9–1.5.

### B.

On December 19, 1989, Richard Lopez was indicted on charges of depraved-mind murder, second-degree murder, manslaughter, felony murder, and arson. On February 8, 1990, the district court found Lopez to be incompetent to stand trial and committed him to the care and custody of the Health and Environment Department for treatment to attain competency to stand trial. The court ordered the Health Department to submit a report to the court within 30 days assessing, among other items, the cause and nature of Lopez's disability and his amenability to treatment to attain competency. The court also ordered that a hearing be held May 10, 1990, to review Lopez's competency to stand trial. The Health Department designated the LVMC–FTU to provide appropriate evaluation and treatment.

On November 5, 1990, the district court determined that Lopez remained incompetent to stand trial and that there was no substantial probability that he would become competent within one year. The court further determined by a preponderance of the evidence that Lopez committed first-degree depraved-mind murder and that he was dangerous. The court reserved a ruling on the sufficiency of the evidence on the remaining counts. The court also ordered that Lopez remain committed at the LVMC–FTU. In March 1991, 1992, and 1993, the hospital provided the district court with written annual updates on Lopez's status. In each update, the hospital reported that Lopez was making essentially no progress toward competency to stand trial and was not likely to

attain such status in the foreseeable future. On February 22, 1994, Lopez filed a motion for writ of habeas corpus and to dismiss the criminal cause against him, arguing that he had been held in pretrial detainment longer than a reasonable amount of time, that his confinement was not in accord with the least drastic means principle, that his confinement constituted cruel and unusual punishment, and that his substantive due process rights were violated.

On October 3, 1994, the district court found that, although Lopez had made substantial progress toward competency to stand trial and there was a substantial probability he would obtain competency in the foreseeable future, he had not yet attained competency. The court also found that he had been confined for a reasonable amount of time, especially considering the seriousness of the charges against him, his disabilities, his history of substance abuse, and his dangerousness. The court also found that he was not entitled to the protection afforded under the civil commitment statutes. To the extent that the court found the least drastic means standard applied, the court determined that Lopez's treatment and confinement satisfied that standard. The court also found that Lopez was not denied equal protection of the law solely because of his pending criminal charges and incompetence, and that the conditions of his confinement did not violate his substantive due process rights to treatment and liberty under the United States or New Mexico constitutions. The court ordered that Lopez remain confined in a secure, locked facility. Lopez appeals from this order.

### C.

On August 6, 1991, Lucille Epperson was charged with aggravated battery and first-degree murder. On December 2, the district court found her to be incompetent to stand trial and committed her to the LVMC–FTU for treatment. The court's final December 2 order stated that Epperson "presents a serious threat of inflicting great bodily harm on

another and is therefore dangerous."[2] Epperson filed a motion to dismiss and release, arguing that, contrary to the requirements of the NMMIC, no ninety-day hearing was held, no one-year review hearing was held, and no resolution of the criminal case had been reached. Sections 31–9–1.3(A), –1.3(D), & –1.4. She also argued that her constitutional rights had been violated. On April 20, 1994, the court denied Epperson's motion and ordered that Epperson be discharged from the LVMC–FTU and allowed to reside at the Highlands Living Center in Denver, Colorado.

After a hearing on the issue of whether Epperson committed the crimes charged, the district court found that the State showed with clear and convincing evidence that she committed the acts of the crimes charged, and that the defense of insanity was not available at a Section 31–9–1.5(A) hearing. The court further found that she remained incompetent to stand trial, that she remained a danger to herself and others, and that she should remain detained until competent to stand trial. Epperson appealed to the Court of Appeals and the case was certified to this Court pursuant to NMSA1978, Section 35–5–14(C)(1). Because Epperson has been released from the LVMC–FTU and is now residing at Highlands Living Center, she is out of the ambit of the NMMIC. Accordingly, the issues presented in her appeal are moot. We do, however, find her arguments instructive in our disposition of the consolidated appeal.

### D.

On September 25, 1990, Joe Martinez was indicted on charges of attempted criminal sexual penetration, attempted kidnapping, and aggravated assault. On March 20, 1991, after having reviewed a competency evaluation, the district court found Martinez to be incompetent to stand trial and committed him to the custody of the Health and Environment Department for treatment to attain competency to stand trial. On April 27, 1992, Martinez filed a motion to compel election pursuant to Section 31–9–1.4. On July 15, the court found that Martinez remained incompetent to stand trial and that he was not likely to attain such competency in one year or the foreseeable future. The court set a hearing on the issue of criminal commitment pursuant to Section 31–9–1.5. This hearing was continued following Martinez's motion to dismiss, in which he argued that his commitment violated his right to equal protection and due process. The court granted Martinez's motion to dismiss, finding that the standard of proof, a preponderance of the evidence,[3] violated the right to due process, that there is no rational basis for treating incompetent criminal defendants differently from civil committees, and that the NMMIC violated an incompetent defendant's right to equal protection. The court dismissed the criminal commitment proceeding and ordered that civil commitment proceedings be instituted within 30 days, otherwise Martinez would be released from custody. The State now appeals.

### E.

On June 1, 1990, Charles Lucas was indicted on charges of armed robbery. On July 24, the district court found Lucas to be incompetent to stand trial and committed him to the forensic unit at the LVMC–FTU. On May 12, 1992, the State motioned the court to set a competency hearing, which was scheduled for August 17, 1992. The record does not indicate whether this hearing was ever held. On February 2, 1994, Lucas filed a motion to dismiss and to release him from custody. He contended inter alia that he had been detained longer than a reasonable period of time, he had been deprived equal protection of laws, his confinement was not in accord with civil commitment or within the

---

**2.** While this language was inadvertently omitted from the court's order of December 2, 1991, the court subsequently amended that order *nunc pro tunc* to include it on October 21, 1993.

**3.** In 1993, apparently in response to *Foucha v. Louisiana*, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (stating that mentally ill person cannot be confined unless state shows "by clear and convincing evidence that the individual is mentally ill and dangerous"), the Legislature amended the NMMIC to require the clear and convincing evidence standard be applied under the NMMIC. 1993 N.M.Laws, ch. 249.

least drastic means principle, his confinement constituted cruel and unusual punishment, and that he was deprived substantive due process. The district court denied this motion and, in the same order, found Lucas to be dangerous. Lucas appealed to the Court of Appeals, which certified the case to this Court, pursuant to Section 35–5–14(C)(1). Lucas was released from custody in January 1995. On May 15, 1995, the State filed a motion to dismiss Lucas's appeal, arguing that because he had been released, the issues he presents on appeal are moot as they apply to him. We agree and grant the State's motion to dismiss Lucas's appeal. As in Epperson's appeal, Lucas's arguments have assisted in our deliberation of the issues in this consolidated appeal.

### F.

We gave leave to file amicus briefs to the New Mexico Council on Crime and Delinquency (NMCCD); the National Association of Criminal Defense Lawyers (NACDL) and the New Mexico Criminal Defense Lawyers Association (NMCDLA); the New Mexico Protection and Advocacy System (NMPAS), the National Association of Protection and Advocacy Systems (NAPAS), and ARC of New Mexico (ARC); and the National Alliance for the Mentally Ill (NAMI) and the Alliance for the Mentally Ill of New Mexico (AMINM).[4]

### II.

■ The law has long recognized that it is a violation of due process to prosecute a defendant who is incompetent to stand trial. *Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *State v. Gallegos,* 111 N.M. 110, 114, 802 P.2d 15, 19 (Ct.App.), *cert.*

*denied,* 111 N.M. 77, 801 P.2d 659 (1990). A person is competent to stand trial when he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and ... he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *State v. Gardner,* 85 N.M. 104, 106, 509 P.2d·871, 873, *cert. denied,* 414 U.S. 851, 94 S.Ct. 145, 38 L.Ed.2d 100 (1973). An accused must have the capacity to assist in his own defense and to comprehend the reasons for punishment. *See Incompetency to Stand Trial,* 81 Harv.L.Rev. 454, 457–59 (1967) (discussing suspension of criminal proceedings where the defendant is incompetent). When there is a question as to the defendant's mental competence to stand trial, any further proceedings must be suspended until the court determines the issue. *Pate,* 383 U.S. at 385, 86 S.Ct. at 842; *State v. Noble,* 90 N.M. 360, 363, 563 P.2d 1153, 1156 (1977). Suspension of the criminal process where the defendant is incompetent is fundamental to assuring the fairness, accuracy, and dignity of the trial. *Incompetency to Stand Trial, supra.*

■ Prior to *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), criminal defendants found to be incompetent to stand trial could be confined until their competence was restored. Defendants whose competence could never be restored were effectively subjected to a lifetime commitment. Grant H. Morris & J. Reid Meloy, Ph.D., *Out of Mind? Out of Sight: The Uncivil Commitment of Permanently Incompetent Criminal Defendants,* 27 U.C.Davis L.Rev. 1 (1993). In *Jackson* the United States Supreme Court ruled that indefinite commitment of a person, for reasons based solely on his incompetence to stand trial, violates the Fourteenth Amendment

---

**4.** Briefs of *amici curiae* were filed in support of Appellants for the New Mexico Council on Crime and Delinquency by Barbara E. Bergman of Albuquerque, New Mexico and James W. Ellis of Albuquerque; the National Association of Criminal Defense Lawyers and the New Mexico Criminal Defense Lawyers Association by Adam G. Kurtz of Albuquerque (NACDL and NMCDLA); Lawrence J. Fleming of St. Louis, Missouri (NACDL Amicus Curiae Committee), and Rich-

ard A. Winterbottom of Albuquerque (NMCDLA and NACDL Amicus Curiae Committee); the New Mexico Protection and Advocacy System and the National Association of Protection and Advocacy Systems, and the ARC of New Mexico by Nancy Koenigsberg of Albuquerque; and the National Alliance for the Mentally Ill and the Alliance for the Mentally Ill of New Mexico by Ronald S. Honberg of Arlington, Virginia and Jerry T. Wertheim of Santa Fe, New Mexico.

guarantee of due process and equal protection. 406 U.S. at 731, 92 S.Ct. at 1854–55. The Court ruled that "[w]ithout a finding of dangerousness, one committed ... can be held only for a 'reasonable period of time' necessary to determine whether there is a substantial chance of his attaining the capacity to stand trial in the foreseeable future." *Id.* at 733, 92 S.Ct. at 1855.

After *Jackson* was decided, New Mexico revised its statutes governing the confinement and treatment of persons found to be incompetent to stand trial. Under the NMMIC, when a question as to a defendant's competency is raised in a criminal case, the court is required to suspend further proceedings until the issue is resolved, Section 31–9–1, and the defendant's competency must be professionally evaluated, Section 31–9–1.1. After the evaluation is completed, the court is required to conduct a hearing on the issue of competency "within a reasonable time but in no event later than thirty days after notification to the court of completion of the diagnostic evaluation." *Id.* If, after the hearing, the court determines that the defendant is incompetent to stand trial but is not dangerous, it may dismiss the case without prejudice and may advise the district attorney to pursue civil commitment under the Mental Health and Developmental Disabilities Code, NMSA1978, §§ 43–1–1 to –25 (Repl. Pamp.1993) (hereinafter "the MHDDC"). Section 31–9–1.2(A). If the court determines that the defendant is incompetent to stand trial and that the defendant is dangerous, it may order treatment to attain competency for a period not to exceed one year. Section 31–9–1.2(B). The defendant must be placed in a "secure, locked facility," Section 31–9–1.2(B)(1), and may be released only by court order, Section 31–9–1.2(B)(2).

Within thirty days of defendant's admission to a treatment facility, the person supervising the defendant's treatment is required to provide to the district court a report that includes an initial assessment, a treatment plan, a report on the defendant's amenability to treatment to render him competent, an assessment on the facility's capacity to appropriately provide treatment, and an opinion on the probability of the defendant's at-taining competency within one year. Section 31–9–1.2(D). Within ninety days of the entry of the order committing defendant to undergo treatment, the court is to hold a hearing to determine whether he is competent, Section 31–9–1.3(A)(1), and if not, whether he is making progress to attain competency within one year from the date of the original finding of incompetency, Section 31–9–1.3(A)(2). If the court determines the defendant is competent, it is required to set the matter for trial. Section 31–9–1.3(C). If the court determines the defendant is incompetent but is making progress toward competency, it may continue or modify the original order. Section 31–9–1.3(D). If the court determines the defendant is still incompetent and is not making progress toward competency such that there is no substantial probability he will attain competency within one year, the court may either release defendant and dismiss the case with prejudice, Section 31–9–1.4(B), dismiss the case with prejudice and refer the defendant to the district attorney for civil commitment under the MHDDC, Section 31–9–1.4(C), or pursue criminal commitment, Section 31–9–1.4(A).

For criminal commitment, the State must establish by clear and convincing evidence that the defendant committed the criminal act charged. Section 31–9–1.5. If the State fails to prove its case, the court will dismiss the criminal case with prejudice. 31–9–1.5(B). The State, however, is not precluded from initiating civil commitment proceedings under the MHDDC. *Id.* If the State does prove that the defendant committed the criminal act charged, the court is required to determine whether the defendant is dangerous. Section 31–9–1.5(C). If the defendant is not dangerous, the court must dismiss the charges without prejudice, and the State may pursue civil commitment under the MHDDC. *Id.* If the court determines by clear and convincing evidence that defendant committed the crime charged and has previously found the defendant dangerous, the defendant must be detained in a "secure, locked facility," Section 31–9–1.5(D)(1), for a period not to exceed the maximum sentence available had he been convicted in a criminal proceeding, Section 31–9–1.5(D)(2). The court is further required to conduct a hear-

ing every two years on the issues of competency and dangerousness. Section 31–9–1.5(D)(4). If at any time the defendant is determined to be competent, the court is required to continue with criminal proceedings. Section 31–9–1.5(D)(4)(a). The defendant must be released if he is not either civilly or criminally committed or if he is determined to be no longer dangerous. Section 31–9–1.5(D)(4)(c).

## III.

We first address whether the NMMIC denies Appellants equal protection of the law. Appellants argue that they are treated differently than persons civilly committed under the MHDDC. Specifically, Appellants argue (1) that the commitment criteria under the NMMIC are less stringent and the release criteria are more stringent than the standards under the MHDDC, (2) that they are denied treatment that is consistent with legitimate treatment objectives, and (3) that their confinement is inconsistent with the least drastic means principle. Appellants contend they are treated differently because of their pending criminal charge and their incompetence to stand trial, which they argue are an insufficient basis for unequal treatment. We disagree with Appellants and hold that the NMMIC does not impinge on equal protection guarantees.

## A.

▮ "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (quoting *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982)). Generally, state "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* at 440, 105 S.Ct. at 3254. Where, however, the legislative classification involves a "suspect class," the legislation is subject to strict scrutiny. Appellants

contend that, in analyzing the constitutionality of the statute, the Court should apply strict scrutiny because the NMMIC affects a "suspect class." We disagree that Appellants constitute a suspect class.

"A suspect class has been defined as a discrete group 'saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" *Richardson v. Carnegie Library Restaurant, Inc.,* 107 N.M. 688, 696, 763 P.2d 1153, 1161 (1988) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973)). "Only statutory classifications based on race, national origin, or alienage so far have been treated as suspect." *Richardson,* 107 N.M. at 696, 763 P.2d at 1161. The class of persons found to be incompetent to stand trial does not meet the established definition of a suspect class.

▮ We recognize, however, that although a classification may not involve a suspect class, strict scrutiny is applied when the classification creates inequalities bearing on fundamental rights. Laurence H. Tribe, *American Constitutional Law* § 16–7, at 1454 (2nd ed. 1988). Involuntary commitment of a person for treatment to attain competency to stand trial impinges on that person's constitutional guarantee of liberty, a "fundamental right." *Cf. San Antonio Indep. Sch. Dist.,* 411 U.S. at 33–34, 93 S.Ct. at 1296–97; *Richardson,* 107 N.M. at 696, 763 P.2d at 1161 (stating that "a fundamental right is that which the Constitution explicitly or implicitly guarantees"). Most provisions in the Bill of Rights are applied to the states because they are determined to be fundamental to the American system of government and inherent in the concept of liberty under the due process clause. In addition, for the purpose of equal protection analysis, these rights are considered to be fundamental. John E. Nowak et al., *Constitutional Law* § XI, at 816 (2nd ed. 1983). "All persons are born equally free, and have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty . . . ." N.M. Const.

art. II, § 4. Indeed, there is no apparent dispute here that confinement in this context impinges the right to liberty. Accordingly, we apply a strict scrutiny standard of review. *See City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254 (stating that strict scrutiny is applied "when state laws impinge on personal rights protected by the Constitution"); *Richardson*, 107 N.M. at 693, 763 P.2d at 1158 (stating that strict scrutiny is applied "when analyzing legislation that infringed fundamental constitutional rights"). Under strict scrutiny, a state law impinging a constitutional right will be upheld only when it serves a compelling governmental interest and is suitably tailored to serve that interest. *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254–55; *Richardson*, 107 N.M. at 693, 763 P.2d at 1158.

### B.

Appellants rely on *Jackson*, 406 U.S. at 730, 92 S.Ct. at 1854, to argue that a person charged with a crime cannot be subject to commitment criteria that are less stringent and release criteria that are more stringent than those applied to persons civilly committed under the MHDDC. Their argument proceeds on two points.

■ First, Appellants argue that a person must have a mental illness to be committed and incompetence to stand trial is not a mental illness. We find no merit in this argument. It is well established that the government may "detain mentally unstable individuals who present a danger to the public and dangerous defendants who become incompetent to stand trial." *United States v. Salerno*, 481 U.S. 739, 748–49, 107 S.Ct. 2095, 2102, 95 L.Ed.2d 697 (1987) (citation omitted). Additionally, due process requires a defendant to be able to understand the charges against him and to assist his attorney in his own defense. *Dusky*, 362 U.S. at 402, 80 S.Ct. at 788. The State has an interest in rendering a defendant competent to stand trial, and, as long as they remain dangerous, the State has an interest in committing them to protect the defendants and the public. Appellants do not dispute their respective district court's findings that they are incompetent to stand trial and dangerous.

■ Second, Appellants contend that a person civilly committed under the MHDDC may be released if the district attorney fails to proceed with a recommitment hearing. *See* Section 43–1–11 & –12. Additionally, Appellants argue that long-term recommitment hearings under the MHDDC must be held annually and that an individual must be released when he no longer meets commitment criteria. *Id.* Appellants argue that criminal defendants are unconstitutionally denied these same protections. We conclude that the release criteria in the NMMIC are constitutional.

At issue in *Jackson* was an Indiana statute that allowed a defendant to be indefinitely committed solely because he was incompetent to stand trial. Jackson was a developmentally disabled deaf-mute with a mental capacity of a pre-school child who was charged with two separate robberies. He was found to be incompetent to stand trial and, because he had neither sufficient intelligence nor necessary communication skills, the trial court committed him to the Department of Mental Health until he became sane. *Jackson*, 406 U.S. at 719, 92 S.Ct. at 1848–49. Indiana's mental incompetency statute allowed commitment until he became competent to stand trial. For Jackson, this meant permanent commitment because his chances of ever meeting competency standards were minimal at best, if not nonexistent. *Id.* at 727, 92 S.Ct. at 1852–53. He, therefore, challenged the constitutionality of the statute, arguing that it violated equal protection guarantees by treating him differently than civilly-committed persons.

The United States Supreme Court ruled that the existence of pending criminal charges did not justify distinguishing Jackson from other defendants with similar mental impairments. The Court compared the commitment criteria and the release criteria of the civil commitment statutes with the commitment criteria and release criteria of the statute under which Jackson was committed. *Id.* at 727–29, 92 S.Ct. at 1852–54. The Court noted that the criteria for commitment under the civil commitment statutes are

more stringent and the release criteria are less stringent than those criteria under the incompetence statute. *Id.*[5] The civil commitment statutes allowed release when the individual no longer needed custodial care, treatment, or detention or when the mental health department considers release would be in his best interest. The statute under which Jackson was committed required only a showing of Jackson's inability to stand trial for commitment and did not provide for release unless he became sane. *Id.* at 729, 92 S.Ct. at 1853–54. The Court, therefore, held that the statute deprived Jackson of equal protection of the laws by subjecting him

> to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to *permanent institutionalization* without the showing required for commitment or the opportunity for release afforded by § 22–1209 or § 22–1907....

*Id.* at 730, 92 S.Ct. at 1854 (emphasis added). The Court also held that a person charged with a crime could only be held for treatment to attain competency "for a 'reasonable period of time' necessary to determine whether there is a substantial chance of his attaining the capacity to stand trial in the foreseeable future." *Id.* at 733, 92 S.Ct. at 1855. Such is not the case here.

The NMMIC provides that "[a] hearing on the issue of the competency of an incarcerated defendant charged with a felony shall be held by the district court within a reasonable time, but in no event later than thirty days." Section 31–9–1.1. The NMMIC provides a series of hearings in which the district court can regularly monitor a defendant's competence and to determine whether criminal proceedings, dismissal, or perhaps civil commitment should be pursued.

Additionally, there are various steps at which the State cannot continue to confine an incompetent defendant and must either re-lease, civilly commit, or prosecute him. That is, a criminal defendant cannot be subject to commitment under Section 31–9–1.2 for any amount of time unless he is both incompetent to stand trial and dangerous. If a defendant is not dangerous, even if he remains incompetent, the district court must dismiss the criminal case but may do so without prejudice and may advise the district attorney to consider civil commitment under the MHDDC. Section 31–9–1.2(A). If at any time the district court determines the defendant is competent to stand trial, it shall continue the criminal proceeding. Section 31–9–1.5(D)(4)(a). Even after a defendant has been criminally committed and if the district court determines the defendant is no longer dangerous, the defendant must be released. Section 31–9–1.5(D)(4)(c). Thus, our statutes do not permit the type of permanent institutionalization proscribed by *Jackson.*

### C.

■ Appellants argue that incompetent defendants are simply detained without an opportunity to receive the same treatment that is afforded to those persons civilly committed under the MHDDC. Specifically, Appellants argue that civil commitment under the MHDDC requires the court to make specific findings that the proposed treatment will benefit the client and that the treating facility must provide treatment consistent with an individualized treatment plan. Appellants argue that no such findings are required to commit a defendant under the NMMIC. We disagree and hold that the NMMIC requires treatment and, when necessary, the treatment shall be the same as that under the MHDDC.

Clearly, the NMMIC is not intended to allow a defendant who is committed to a facility to languish unattended. To the contrary, a defendant is committed specifically to undergo treatment to attain competency.

---

5. The Court noted that commitment of mentally ill under Section 22–1209 required "(1) a showing of mental illness and (2) a showing that the individual is in need of 'care, treatment, training or detention' " while release required a " 'superintendent or administrator shall discharge such person, *or* [when] cured of such illness.' " Commitment of the feeble-minded under Section 22–1907 required a showing that a person is " 'unable properly to care for [himself]' " and release was allowed "when his condition 'justifies it.' " *Jackson,* 406 U.S. at 727–29, 92 S.Ct. at 1852–54.

Section 31–9–1.2(B). Indeed, when the district court deems treatment necessary, it may order such treatment, which shall be the same treatment "available to involuntarily committed persons," civil committees. Section 31–9–1.2. The only difference between the treatment rendered under the NMMIC and that rendered under the MHDDC is location: an incompetent defendant under the NMMIC shall be treated in a "secure, locked facility." Section 31–9–1.2(B)(1). Once entered, the court's order is not to be considered a simple benign suggestion. In accordance with the statute's mandate, the court order *requires* treatment. The order requires the defendant to undergo treatment and requires the treating facility to render that treatment.

Additionally, the court-ordered treatment must be tailored to render a particular defendant competent to stand trial. The NMMIC includes several points at which the district court shall monitor the sufficiency of the treatment. For example, Section 31–9–1.2(D) requires the treating facility to file "an initial assessment and treatment plan and a report on the defendant's amenability to treatment . . . , an assessment of the facility's or program's capacity to provide appropriate treatment . . . and an opinion as to the probability of the defendant's attaining competency within a period of one year . . ." with the court within thirty days after a defendant has been admitted to a facility to undergo treatment to attain competency. The Legislature provided a means for the district court to determine whether the treatment order is being properly effectuated, and whether the treatment will benefit the defendant. If the treatment is insufficient, the district court, upon reviewing the report, may modify it accordingly.

Additionally, Section 31–9–1.3(B) requires the treating supervisor to file a progress report with the district court that outlines inter alia clinical findings and an opinion as to the defendant's competency or the defendant's progress toward attaining competency within one year. Section 31–9–1.3(B)(2).

Using this report, the district court must conduct a hearing to determine whether the defendant is competent to stand trial, whether he should plead, Section 31–9–1.3(A)(1), and if not, whether the defendant is making progress to attain competency within one year, Section 31–9–1.3(A)(2). The latter determination cannot and should not be made without the district court first inquiring into the sufficiency of the treatment that either has been rendered or, if necessary, will be rendered or, if necessary, will be rendered in the future.

The MHDDC defines "treatment" as "any effort to accomplish a significant change in the mental or emotional condition or behavior." Section 43–1–3(T). Under the NMMIC, the "significant change" in mental condition is competence to stand trial. Although the focus of treatment under the NMMIC,[6] treatment to attain competency, is distinct from the focus of treatment rendered under the MHDDC, the particular treatment design may be the same. This is not to say, however, that in all incompetency treatment cases, the treatment shall be identical as under the MHDDC. To so hold would impose a treatment design in cases where it is unwarranted and would undermine the judgment of the treating professional. Rather, we hold that the type of treatment rendered under the MHDDC shall not be denied in cases under the NMMIC where it is necessary.

Finally, a defendant who has been criminally committed pursuant to Section 31–9–1.5 shall be afforded continued treatment to attain competency. The NMMIC requires that at least every two years after a defendant has been criminally committed, "the district court shall conduct a hearing . . . on the issues of trial competency and dangerousness." Section 31–9–1.5(D)(4). Similarly, if at any time during criminal commitment a defendant becomes competent to stand trial, "the court shall continue with the criminal proceeding." Section 31–9–3(D)(4)(a). It is true that a defendant who has been criminal-

---

6. Under the NMMIC, the objective is to treat the criminal defendant such that he "has sufficient present ability to consult with his lawyer with a reasonable degree of understanding—and . . . has a rational as well as factual understanding of the proceedings against him." *Dusky,* 362 U.S. at 402, 80 S.Ct. at 788 (stating test to determine whether defendant is competent to stand trial).

ly committed has exhibited a reduced likelihood in attaining competency to stand trial. Nonetheless, it logically follows that by requiring continued monitoring for any changes in the defendant's mental condition and dangerousness, the Legislature expects treatment to continue. Indeed, it is unrealistic to expect a defendant to spontaneously, without treatment, become competent in order to continue criminal proceedings or to become no longer dangerous in order to justify release. *See* Section 31–9–1.5(D)(4)(c).

■ We conclude that when a defendant has been found dangerous under the NMMIC, *see* § 31–9–1.2(C), treatment to alleviate the threat of dangerousness is as important as treatment to obtain competency: "[T]he failure to provide habilitative services tailored to the defendants' needs may result in needlessly protracted, possibly lifelong confinement." James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo.Wash.L.Rev. 414, 424–25 (1985) (footnote omitted). We see no basis within the statutory scheme for distinguishing a defendant who has been criminally committed pursuant to Section 31–9–1.5 from those subject to the expedited schedule of hearings provided prior to the Section 31–9–1.5 hearing. We conclude that equal protection principles require that defendants criminally committed under Section 31–9–1.5 be afforded treatment comparable to that available to those awaiting a hearing under that section. We construe the Legislature's intent as requiring a result consistent with those principles. So construed, we are satisfied there is no constitutional infirmity.

### D.

■ Next, Appellants argue that the NMMIC deprives them of equal protection because their commitment is not in accordance with the "least drastic means principle," which civil committees are afforded under the MHDDC. Appellants argue, for example, that persons committed under the MHDDC are provided an opportunity to earn liberties or transfers to less restrictive environments while the NMMIC does not afford defendants the same right.

The MHDDC provides that persons receiving mental health services, Section 43–1–7, and persons receiving developmental disabilities services, Section 43–1–8, each have the right to services consistent with the least drastic means principle. The concept, "consistent with the least drastic means principle," is defined as

the habilitation or treatment and the conditions of habilitation or treatment for the client, separately and in combination:

(1) are no more harsh, hazardous or intrusive than necessary to achieve acceptable treatment objectives for the client;

(2) involve no restrictions on physical movement and no requirement for residential care *except as reasonably necessary for the administration of treatment or for the protection of the client or others from physical injury;* and

(3) are conducted at the suitable available facility closest to the client's place of residence.

Section 43–1–3(D)(1)–(3) (emphasis added). Appellants do not present any meaningful argument that their treatment to attain competency is "more harsh, hazardous or intrusive than necessary" or that their confinement is not a "suitable available facility closest to [their] place of residence." Although the MHDDC may afford civil committees certain liberties and transfers to less restrictive environments, those privileges may be afforded only when the committee's dangerousness is considered. Logically, those civilly-committed individuals who present a high risk to themselves or others should not receive the same privileges as those who present a low or no risk. This is not the case under the NMMIC: A criminal defendant undergoing treatment to attain competency is confined not only for treatment but also because he already has exhibited dangerous conduct. *See Jones v. United States,* 463 U.S. 354, 364, 103 S.Ct. 3043, 3049–50, 77 L.Ed.2d 694 (1983); *see also Lynch v. Overholser,* 369 U.S. 705, 714, 82 S.Ct. 1063, 1069, 8 L.Ed.2d 211 (1962) (stating that person found to have committed criminal act indicates dangerousness). Under the NMMIC and the MHDDC, there is a difference between the standards for dan-

gerousness within the two commitment criteria. Under the NMMIC, a defendant may be criminally committed if, by clear and convincing evidence, he or she committed the act or acts underlying the crime or crimes charged and is dangerous; "dangerous" means that, if released, the defendant presents a serious threat of inflicting great bodily harm on another or of criminal sexual penetration or criminal sexual conduct. *See* Sections 31–9–1.2 & –1.5 (Cum.Supp.1995). Under the MHDDC, on the other hand, a person may be civilly committed if by clear and convincing evidence, he or she suffers from a mental disorder that presents a likelihood of serious harm to himself or others. *See* NMSA 1978, § 43–1–11 (Repl.Pamp. 1993). Since commitment under the NMMIC serves a different purpose than that under the MHDDC, the two schemes do not warrant identical analysis. Thus we find no violation of the guarantee of equal protection.

### IV.

Next, we address whether the statute deprives Appellants of substantive due process. Appellants argue that the statute violates their substantive due process rights with regard to the nature and duration of their incarceration, their treatment, and their confinement, which they argue are not in accordance with the least drastic means principle.

### A.

"[S]ubstantive due process prevents the government from engaging in conduct that 'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty.'" *Salerno*, 481 U.S. at 746, 107 S.Ct. at 2100 (citations omitted). It prevents the state from impinging on a person's liberties or rights of fundamental constitutional magnitude unless it proves that the law is necessary to promote a compelling or overriding interest. *See* Nowak, *supra* § IV, at 448. As we recognized above, involuntary commitment for treatment to attain competency to stand trial impinges on Appellant's right to liberty.

### B.

■ Appellants rely primarily on *Jackson v. Indiana* to argue that the nature and duration of their confinement allowed by the statute deprives them of their substantive due process rights. Specifically, Appellants argue that they have been held longer than permitted by *Jackson* because there is no substantial probability they will become competent in the foreseeable future, and that they have been confined beyond a "reasonable period of time." Appellants also argue that neither their progress towards attaining trial competency nor their dangerousness justifies their continued confinement. We hold that the statute does not deprive Appellants of their substantive due process rights.

In *Jackson* the Supreme Court stated that "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson*, 406 U.S. at 738, 92 S.Ct. at 1858. The Court, therefore, held that "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the *reasonable period of time* necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future," otherwise, the defendant would have to be civilly committed or released. *Id.* Further, the Court held that even if the defendant may "probably soon be able to stand trial, his continued commitment must be justified by progress toward that goal." *Id.* The Court refrained from setting arbitrary time limits but determined that Jackson's three and one-half years of commitment was enough for Indiana to determine whether he could ever stand trial. *Id.* at 738–39, 92 S.Ct. at 1858–59.

New Mexico's statute satisfies *Jackson* because it requires more than mere incompetence for commitment to treatment. The NMMIC requires that a criminal defendant be committed to treatment only if he is both incompetent to stand trial *and* dangerous, otherwise the district court must either dismiss the criminal case or advise the district attorney to proceed with civil commitment proceedings. Section 31–9–1.2(A)–(B).

When the district court finds both incompetence and dangerousness, it may order treatment but only for a period not to exceed one year. Section 31–9–1.2(B).

Additionally, once the defendant is committed and is undergoing treatment, the statute requires the district court to periodically monitor whether he is making any progress toward competency such that he may become competent within the one-year time frame. Within thirty days after the defendant is admitted for treatment, the court must receive an opinion from the treating facility as to the probability of the defendant's attaining competency within the one-year time frame. Section 31–9–1.2(D). In effect, *Jackson* requires that if the treating facility opines that there is no probability the defendant will attain competency, there is no longer any justification to confine the defendant for treatment. Within ninety days of the entry of the treatment order, the court again must determine whether the defendant is making progress under the treatment toward attainment of competency within the one-year time frame. Section 31–9–1.3(A)(2). Pursuant to *Jackson*, the district court can continue treatment only if the defendant is making progress toward attaining competency within the one-year time frame. Section 31–9–1.3(D).

We also hold that the duration of commitment is not unreasonable. Again, pursuant to *Jackson*, once the district court determines that there is no substantial probability that a defendant will attain competency, continued commitment can no longer be justified. This determination may be made "at any time," Section 31–9–1.4, in which case the district court may either set the matter for hearing, Section 31–9–1.4(A), release the defendant, Section 31–9–1.4(B), or dismiss the case without prejudice and refer the defendant for possible civil proceedings under the MHDDC, Section 31–9–1.4(C). Certainly, this determination can be made within thirty days after the defendant is admitted to treatment, provided adequate notice is given to the State. Section 31–9–1.2(D). If the determination is not made then, it could still be made within ninety days of the district court's order to commit the defendant for

treatment. Section 31–9–1.3(2). Logically, in order for the district court to make this determination, the treating facility must have a "reasonable amount of time," *see* Section 31–9–1.4, to evaluate and assess the probability that the defendant will attain competency. The time limits built into the statute represent a reasonable duration to allow the treating facility to make this determination and "bear some reasonable relation to the purpose for which the individual is committed." *Jackson*, 406 U.S. at 738, 92 S.Ct. at 1858. Accordingly, we hold that the statute is in accord with *Jackson* because it allows commitment for treatment to obtain competency for only a "reasonable period of time" and requires that defendant make progress toward competency for continued commitment not to exceed one year.

Appellants also contend that although New Mexico's legislation is patterned after the American Bar Association's (ABA) standards, *see* ABA Criminal Justice Mental Health Standards (1989), it reflects the oppressive components only and omits the features that would save it as constitutional. Although we recognize the practical merit in the ABA standards, constitutional validity does not depend on whether the NMMIC fully reflects such standards. *Gallegos*, 111 N.M. at 117, 802 P.2d at 22. While the NMMIC does not include all the recommended standards of the ABA, we refuse to usurp the power of the Legislature by imposing those standards.

Appellants rely on *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), to argue that the State does not provide them with the training and treatment designed to address their ability to live safely in society. *Youngberg* involved a retarded man who was involuntarily committed because of his inability to care for himself. During his commitment, he was frequently subjected to violence from other residents and he frequently injured himself as well. As a result, he was constrained to bodily-restraint devices. The Supreme Court held that he was entitled to safe conditions, freedom from restraints, and training to ensure his safety and freedom. *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462–63.

*Youngberg* is inapplicable because Appellants have not claimed they have been subjected to violence or are otherwise subjected to violence, unsafe conditions, or bodily restraints. Additionally, it is the MHDDC and not the NMMIC that addresses a person's ability to function in society. The MHDDC applies to civil committees and to criminal defendants who will not likely attain competency to stand trial. The purview of the NMMIC, on the other hand, is more narrow—to ensure that a defendant is competent to stand trial on criminal charges. Although the NMMIC does not mandate a particular treatment plan, the plan must be tailored to meet that end. Indeed, it would be incongruous to mandate by statute any one treatment plan for all defendants. Given the particular needs of individual defendants, this approach would likely be inefficient, if not altogether ineffective. Rather, the NMMIC leaves the particular treatment to the discretion of qualified professionals. These professionals are required to timely report to the district court on the treatment plan. Additionally, the NMMIC requires the district court to not only ensure that these reports are timely filed, but also to review the report itself for full compliance. Hence, the NMMIC provides a comprehensive scheme to ensure incompetent defendants receive the necessary treatment. Any alleged defect in treatment is not due to unconstitutionality. Rather, any alleged defect in treatment is likely the result of noncompliance with the statute's mandate by those charged with administering it.

## V.

We now address whether the NMMIC deprives Appellants of procedural due process. Appellants and amicus curiae argue that a defendant's right to procedural due process is violated because criminal commitment under Section 31–9–1.5 requires only clear and convincing evidence rather than proof beyond a reasonable doubt. Appellants and amicus also contend that a defendant's right to procedural due process is violated because the NMMIC prohibits use of the insanity defense when facing criminal commitment.

## A.

Appellants argue that criminal commitment under Section 31–9–1.5 (the "Section 1.5 hearing") should require proof beyond a reasonable doubt, contending that the Section 1.5 hearing has all the relevant trappings of a criminal proceeding. As grounds for a higher burden of proof, Appellants point to the possibility of incarceration if they are found to have committed the criminal act charged, the inevitable stigmatization of such a finding, and the risk of erroneous decision-making in the adjudication. Amicus argues that incompetent defendants may be confined for a term equal to the maximum term had they been criminally convicted without the chance of receiving good-time credits, which even a convicted defendant may receive. We are not persuaded that the requirement of proof beyond a reasonable doubt is required by either the federal or our state constitution.

In *Addington v. Texas,* the United States Supreme Court, in discussing the correct standard for civil commitment, stated

> [t]he function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."

441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (quoting *In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 1075–76, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)). "The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Id.* In determining the proper standard, both the individual's interest and the state's interest must be assessed, while keeping in mind that the "function of legal process is to minimize the risk of erroneous decisions." *Id.* at 425, 99 S.Ct. at 1809 (citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *cf. Board of Educ. of Carlsbad v. Harrell,* 118 N.M. 470, 478, 882 P.2d 511, 519 (1994) (applying *Mathews* in determining procedural due process)).

It is indisputable that commitment pursuant to Section 31–9–1.5 results in a loss of liberty. Thus, a defendant must be afforded due process to ensure that the decision to commit him is made with minimal risk of error. To be sure, proof beyond a reasonable doubt would reduce any risk. Nevertheless, the question involves balancing several factors. Under federal law, the United States Supreme Court has traditionally employed the test of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), which involves balancing several factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requisites would entail.

*Id.* at 335, 96 S.Ct. at 903. This test has been employed in both civil and criminal cases. *See, e.g., Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990); *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53 (1985). We apply it here as well.

Although due process dictates that a state cannot criminally prosecute an incompetent defendant, the State has a compelling interest in committing him under Section 31–9–1.5. First, the State's interest arises from its *parens patriae* powers to provide care to its citizens when necessary. In this context, the care necessary is treatment to attain competency to stand trial. Second, the State's interest arises from its police power—its authority to provide its citizenry a safe community in which to live. *Salerno*, 481 U.S. at 749, 107 S.Ct. at 2102–03 (stating that government has compelling interest in preventing crime by arrestees). This authority extends to a defendant who poses a danger not only to the general society but to himself as well. *Cf. Addington*, 441 U.S. at 426, 99 S.Ct. at 1809–10.

The fact that a criminal defendant is detained for a period of time does not inexora-bly mean the State has imposed punishment. *Salerno*, 481 U.S. at 746, 107 S.Ct. at 2102. Rather, because the State seeks to treat an incompetent and to protect the community from danger, detention serves a regulatory rather than a punitive function. *See id.* at 747, 107 S.Ct. at 2101–02 (stating that pretrial detention serves regulatory and not penal function and does not violate substantive due process). "[P]reventing danger to the community is a legitimate regulatory goal." *Id.* An incompetent defendant facing commitment under Section 31–9–1.5 has committed a criminal act and has already been determined to be dangerous. If an incompetent criminal defendant is not dangerous, he must either be released or be civilly committed. *Jackson*, 406 U.S. at 732, 92 S.Ct. at 1855. However, the State cannot release into society an incompetent defendant who has demonstrated a capacity for serious, violent conduct.

There is a real distinction between the purpose of commitment under Section 31–9–1.5 and a criminal prosecution. *Addington*, 441 U.S. at 428, 99 S.Ct. at 1810–11. First, criminal prosecution establishes criminal liability for purposes of rendering punishment. *Id.* To justify further commitment for treatment to attain competency, a Section 31–9–1.5 hearing establishes only whether the defendant committed the criminal act.

"The heavy standard applied in criminal cases manifests our concern that the risk of error to the individual must be minimized even at the risk that some who are guilty might go free." *Id.* The full force of that concern is not present here. While a defendant may be erroneously committed under Section 31–9–1.5, there are sufficient means by which the error may be corrected. *See id.,* at 428–29, 99 S.Ct. at 1810–11. A defendant's condition shall continue to be treated and monitored and "significant changes ... shall be reported in writing to the district court, state and defense." Section 31–9–1.5(D)(3). Further, "at least every two years the district court shall conduct a hearing" and "shall enter findings on the issues of trial competency and dangerousness." Section 31–9–1.5(D)(4). Thus, the concern of possible risk of error that warrants a higher

standard of proof for criminal prosecution does not apply here. *See id.*

The standard of clear and convincing evidence strikes a fair balance between the defendant's interest in avoiding an erroneous deprivation of liberty and the State's interest in treating the defendant, protecting the defendant from himself, and protecting society in general. Further, any risk of an erroneous decision from applying this standard is insufficient to warrant a higher standard.

### B.

■ Appellants and amicus contend that a defendant's right to procedural due process is also violated because the NMMIC prohibits the use of the insanity defense when facing criminal commitment in a Section 1.5 hearing. We disagree. Our Court of Appeals, in *State v. Werner,* 110 N.M. 389, 796 P.2d 610 (Ct.App.), *cert. denied,* 109 N.M. 704, 789 P.2d 1271 (1990), addressed this issue, upholding Section 31–9–1.5 and determining that in a Section 1.5 hearing incompetent defendants do not have a right to assert the defenses of insanity or inability to form specific intent. Although Appellants contend that *Werner* is not applicable because the Court of Appeals resolved the issue on statutory construction grounds and not on constitutional considerations, we find its reasoning applicable and uphold Section 31–9–1.5 as constitutional.

In *Werner,* appellant relied on the Section 31–9–1.5(A), which states, "[T]he state and the defendant may introduce evidence relevant to the question of the defendant's guilt of the crime charged," to argue that the Legislature intended that the defense of insanity be allowed in this hearing. 110 N.M. at 390, 796 P.2d at 611. The Court rejected that contention, reasoning that Section 31–9–1.5 should be read in view of its objective and the wrong to be remedied. *Id.* at 391, 796 P.2d at 612. Specifically, the Court explained that the statute serves two purposes: It gives the defendant an opportunity to prove his innocence, and it protects society from dangerous persons. *Id.* Further, as we have distinguished above, the hearing is not a trial to establish criminal culpability, for which evidence relating to both *actus*

*reus* and *mens rea* clearly would be relevant. Rather, to justify further commitment for treatment, the hearing is to determine whether the defendant committed the criminal *act.* Hence, any evidence relating to the defendant's state of mind at the time the criminal act was committed is irrelevant. *Id.* It is a clear violation of due process to prosecute an incompetent defendant in an effort to determine criminal culpability. Indeed, to effectively allow the same inquiry in another forum while the defendant remains incompetent may itself be unconstitutional.

### VI.

The NMMIC provides a series of deadlines at which the district court must hold hearings to determine issues of competency, dangerousness, and criminal conduct. Appellants Rotherham and Lucas argue that virtually every significant deadline has been violated in their respective cases. Appellants compare the time limitations to the "six-month rule," SCRA 1986, 5–604(D) (1992 Repl.Pamp.) (providing for dismissal if trial is not commenced within applicable six-month time period), and contend that any deadline violations under the NMMIC should have the same result as a violation under the "six-month rule"—an automatic dismissal. At oral argument, the State explained that the hearings are based on information contained in the reports from the treating supervisor and cannot be held until the reports are properly filed, effectively putting the time of the hearings beyond the State's control. While we do not recognize any parallel to the six-month rule, the State has the duty to ensure that each provision of the NMMIC is administered within the required time limitations.

In *State v. Mendoza* we applied a "common sense approach" to hold that the six-month rule did not prevent recommencement of the six-month time period after a defendant is found competent to stand trial. 108 N.M. 446, 448–49, 774 P.2d 440, 442–43 (1989); *see also State v. Flores,* 99 N.M. 44, 46, 653 P.2d 875, 877 (1982) (stating that six-month rule "is to be read with common sense"). We reasoned that the delay to determine trial competency is necessary to preserve due pro-

cess guarantees and is for the benefit of the defendant. Therefore, any resulting delay "must be excluded from any speedy trial analysis." *Mendoza,* 108 N.M. at 449, 774 P.2d at 443.

Still, an incompetent defendant cannot be committed for more than a "reasonable period of time" than necessary to determine whether he will be rendered competent to stand trial in the foreseeable future. *Jackson,* 406 U.S. at 733, 92 S.Ct. at 1855–56. Our Legislature adopted a system of hearings, complete with time limitations, to ensure that a defendant's commitment is no longer than a "reasonable period of time." Thus, it would be contrary to the statute's objective, and indeed the constitution, to allow these time limitations to be ignored. The inevitable result would be commitment for a period longer than what the Legislature has deemed reasonable. Hence, the State has the responsibility to ensure that a defendant's commitment is no longer than "reasonable" and that all statutory procedures are timely effectuated. *Cf. County of Los Alamos v. Beckman,* 120 N.M. 596, 599, 904 P.2d 45, 48 (Ct.App.1995) (citing *State v. Mascarenas,* 84 N.M. 153, 155, 500 P.2d 438, 440 (Ct.App.1972) (stating that accused has no duty to bring on own trial).

We do not agree that the remedy for delay is automatic dismissal. This, too, would go beyond legislative intent. Significantly, the Supreme Court in *Jackson* did not articulate a hard and fast time limitation on commitment to attain competency, requiring only that commitment be for a "reasonable period of time." We too expect there may be reasonable delays in administration and treatment that would require hearings to be held later than anticipated. When neglect by the State leads to unreasonably lengthy commitment, delay will not be excused. On the other hand, delay caused by a defendant's own initiative will not suffice for dismissal. *State v. Bishop,* 108 N.M. 105, 108, 766 P.2d 1339, 1342 (Ct.App.1988) (stating that

"[w]aiver is an intentional abandonment of a known right"). We hold that if the district court finds that the statutory process has been delayed such that commitment has been longer than a "reasonable period of time," [7] it may then proceed under either Section 31–9–1.4(B) or Section 31–9–1.4(C).

## VII.

We hold that New Mexico's Mental Illness and Competency code is not unconstitutional. We also hold that any alleged deficiency in the treatment rendered to incompetent criminal defendants is not due to alleged unconstitutionality of the NMMIC. Rather, without defining the particular treatment for each defendant, the NMMIC properly requires treatment to be administered by qualified professionals. Thus, any claim that treatment is insufficient would be properly directed to those responsible for its specific design and administration. We, therefore, affirm the statute's application to Appellant Lopez. We also remand the cases of Appellants Martinez and Rotherham for further proceedings as required under Section 31–9–1.5 of the NMMIC. We also have considered specific arguments made on behalf of individual defendants and conclude that our disposition of the common constitutional arguments makes it unnecessary to address any of the specific arguments unique to any particular defendant.

**IT IS SO ORDERED.**

FROST, C.J., and FRANCHINI, J., concur.

MINZNER, J. (specially concurring).

RANSOM, J. (joining in special concurrence).

MINZNER, Justice (specially concurring).

I concur in the majority's opinion, but write separately to address additional issues under the Mental Health and Developmental

---

**7.** The State's power to commit an individual for the purpose of treatment to competency is limited. We are aware that all but one of these defendants has been or was incarcerated in excess of four years. We cannot tell whether the lengthy periods of confinement resulted from waiver by or acquiescence of defendant or defendant's counsel or through neglect. We trust that on remand the trial court will entertain all appropriate arguments regarding the length of time each defendant for whom further proceedings are required has already been incarcerated.

Disabilities code ("the MHDDC"), NMSA 1978, §§ 43-1-1 to -25 (Repl.Pamp.1993), and the New Mexico Mental Illness and Competency code ("the NMMIC"), NMSA 1978, §§ 31-9-1 to -4 (Repl.Pamp.1994 & Cum.Supp.1995), raised by Appellant Richard Lopez or suggested by his circumstances. Lopez's issues and particularly his circumstances seem to me to present issues in addition to those raised and argued by the other appellants or presented by their circumstances.

Because I conclude that the State may continue to confine Lopez, I agree that we should affirm the trial court's order denying release. I also would affirm his 1994 order on periodic review. The record indicates that a subsequent, two-year periodic review is pending before the trial court.[1]

**Additional Facts Regarding Lopez's Circumstances and Issues Raised by Lopez.**

In May 1990, Lopez's treating physicians filed with the trial court a treatment plan which contained five objectives of diagnosing and treating Lopez with the goal of rendering him competent to stand trial. In October 1990, the court, following a hearing, found that there was no substantial probability that Lopez would become competent to stand trial by October 12, 1991, a year from the date of the hearing. In November 1990, the court conducted a Section 31-9-1.5 hearing. Between 1990 and 1993, Lopez's physicians at the Las Vegas Medical Center-Forensic Treatment Unit ("the LVMC-FTU") filed treatment and update reports with the court, stating that Lopez had shown minimal compliance with treatment. In April 1994, Dr. John Gatling, Lopez's treating physician, testified during a hearing before the court that he didn't think he would be able to treat Lopez to competency. Despite this testimony, the trial court concluded:

> Although [Lopez] has made only minimal progress towards competency, in the period 1990 through March of 1993, he has—those are pursuant to those three annual reports that I have seen, plus the testimony at the April 1994 hearing—since then

he has made substantial progress. Not nearly as much as I would like to see, but substantial progress towards attaining competency as a result of the May 11, 1990 treatment plan and his care and supervision at Las Vegas Medical Center.

Lopez challenges the trial court's finding that he stands a substantial likelihood of attaining competency in the foreseeable future as not supported by the evidence. He also argues that the findings are not sufficient to support his continued confinement and that the trial court made its findings pursuant to the wrong standard.

The record contains two orders entered by the trial court in this case. The first is an order entered on Lopez's motion to dismiss and petition for writ of habeas corpus. The second is the court's order entered on periodic review. Neither order references the burden of proof the trial court believed to be applicable. Lopez relies on an oral comment by the trial court to the effect that the court found it possible that he would obtain competency within a reasonable time, but only by a preponderance of the evidence. We will not rely on the trial court's oral comment to reverse. "Oral statements of a judge in articulating [a] ruling at the close of trial do not constitute a 'decision' within the meaning of [SCRA 1986, 1-052(B)(1)(a) (Repl. Pamp.1992) ], and error may not be predicated thereon." *Balboa Constr. Co. v. Golden*, 97 N.M. 299, 304, 639 P.2d 586, 591 (Ct.App. 1981).

The order entered on Lopez's motion to dismiss contains no finding regarding the likelihood of his attaining competency. The order entered on periodic review contains a finding regarding the likelihood of Lopez's attaining competency. There is no statutory requirement that the trial court make a finding regarding the likelihood of Lopez's attaining competency on periodic review following a Section 31-9-1.5 hearing. The order entered contains findings that track the statutory requirements for the proceedings conducted by the trial court. The appropriate standard of review is whether substantial

---

1. The transcript of that hearing contains testimony that Lopez's condition has changed and that

the court is considering the legal consequence of those changes.

evidence supports the trial court's findings. *In re Pernell,* 92 N.M. 490, 495, 590 P.2d 638, 643 (Ct.App.1979). On appeal an appellant is required to include in the brief-in-chief a specific challenge to a finding of fact or that finding will be "deemed conclusive." SCRA 1986, 12–213(A)(3) (Cum.Supp.1995). Further, the appellant must include in the summary of proceedings "the substance of the evidence bearing upon the proposition, and the argument [must have] identified with particularity the fact or facts which are not supported by substantial evidence." *Id.* In this case, Lopez has not summarized the evidence regarding his progress from March 1993 to April 1994. In addition, there has been no specific attack on the additional finding that "further treatment ... likely will result in further progress and improvement ... toward attaining competency."

I conclude that the issue of the sufficiency of the finding regarding competency is not properly before us. The arguments on appeal have been constitutional challenges to the validity of the statutory scheme as a whole. The attack on the findings in this case seems intended to provide additional support for Lopez's characterization of the statute as authorizing unlawful confinement. No independent basis for reversal has been identified.

## Lopez's Right to Substantive Due Process.

As the majority opinion notes, the NMMIC initially requires an expedited schedule of hearings regarding competency. *See* op. at 1138–39; *see also* 1141. I think that the statutory schedule satisfies Lopez's constitutional rights to equal protection and due process, and particularly the holding in *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), during the period in which the statute requires an expedited schedule. However, during the period after a Section 31–9–1.5 hearing, the schedule of hearings is no longer expedited; this portion of the statute contains no reference to treatment, extends the time between court hearings to two years, and permits confinement up to the length of the permissible criminal sentence. The statute appears to establish confinement for dangerousness and incompetency not likely to be remedied within a reasonable time; a different kind of confinement than the period prior to the so-called "merits" hearing in which the Legislature has required that the district court inquire into the likelihood of a defendant attaining competency within a reasonable period.

While Section 31–9–1.5 clearly mandates treatment to competency, it is unclear whether defendants are also to be afforded treatment addressed to their dangerous and disabling conditions. At present, the statute only requires the State to review a defendant's condition every two years after an initial determination that the defendant committed the crime and is still dangerous. If the defendant is found to be competent, then the criminal case will proceed; otherwise, the State may detain defendants in a secure, locked facility for up to the maximum duration of their sentence.

Existing United States Supreme Court precedents suggest a direction, but they do not compel a particular answer. No state statute seems comparable to New Mexico's, and thus precedent from other jurisdictions is of limited help in resolving this case. In the absence of controlling federal precedent or helpful state law opinions, I believe that we must identify the Legislature's particular purpose in providing for the period of confinement following a Section 31–9–1.5 hearing. Then, to satisfy the Due Process Clause of the New Mexico Constitution, *see* N.M. Const. art. II, § 18, we must be satisfied that the period of confinement after the Section 31–9–1.5 hearing is narrowly tailored to serve that purpose. *See generally Marrujo v. New Mexico State Highway Transp. Dep't,* 118 N.M. 753, 757, 887 P.2d 747, 751 (1994) (comparing substantive due process and equal protection analysis); *see also State v. Post,* 197 Wis.2d 279, 541 N.W.2d 115 (1995) (applying strict scrutiny to an involuntary commitment statute).

Lopez specifically challenges the limited kinds of treatment available to him at the LVMC–FTU. Dr. Gatling testified that he is limited in his ability to treat Lopez properly due to his commitment at the LVMC–FTU as opposed to the civil wing of the hospital, where a wider range of treatments is avail-

able. Lopez alleges that the nature of his confinement violates his right to substantive due process because the LVMC–FTU cannot and does not provide the type of treatment necessary to address his conditions. Counsel for Lopez argues that ultimately because of his status, i.e., commitment to an FTU, Lopez's condition may deteriorate, since there have been inadequate efforts to restore him to a minimal level of functioning. Moreover, Amici assert that Section 31–9–1.5 restricts and curtails opportunities for treatment and rehabilitation for individuals such as Lopez because it effectively allows the State to subject defendants to an indefinite "treat to competency" status. Lopez seeks transfer to the civil side of the Las Vegas Medical Center for the purpose of obtaining proper treatment.

The majority opinion indicates that treatment available in civil commitments shall not be denied to those held for treatment to regain competency. Op. at 1141–43. Further, the majority opinion indicates that this broader range of treatment is also available to those committed to a "secure, locked facility" pursuant to Section 31–9–1.5(D)(1). Op. 1143. I agree with the majority that the State has a legitimate interest in confining incompetent, dangerous defendants to a secure, locked facility; I also agree with the explicit holding of the majority, that the broader range of treatment is available to those confined to a secure, locked facility, as a matter of equal protection. That is, it makes little or no sense to preclude those committed to a secure, locked facility following a Section 31–9–1.5 hearing from the broader range of treatment available to those who have not yet had the hearing. After all, those who have not had that hearing presumably are viewed as likely to attain competency within a reasonable period of time. For them, treatment to competency may be all that is appropriate or necessary. For the following reasons, however, I would also hold that following the Section 31–9–1.5 hearing, incompetent, dangerous defendants have a right to treatment for both of the conditions that serve as the basis for their confinement throughout their confinement as a matter of substantive due process under the New Mexico Constitution.

*Eckerhart v. Hensley,* 475 F.Supp. 908 (W.D.Mo.1979), recognized that persons who are mentally ill or who are mentally retarded and are dangerous to either themselves or others have a right to treatment whether they are hospitalized through a criminal or civil process. As a matter of federal due process, the district court in *Eckerhart* required treatment that afforded the affected individuals a reasonable opportunity to be cured or to improve their mental condition, and that the required treatment be directed to that aspect of behavior which caused the confinement. *Id.,* 475 F.Supp. at 914. Although that right is not sufficiently well-established that I can say federal due process requires us to reach that result in this case, I would require that result under the New Mexico Constitution.

The confinement in this case is in effect pretrial detention in a mental institution. In *Bell v. Wolfish,* 441 U.S. 520, 537, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979), a challenge to the conditions of confinement in a custodial facility, the United States Supreme Court held that pretrial detainees, not yet convicted of the crimes charged, could not be punished. Therefore, in reviewing challenges to the conditions of pretrial confinement, the inquiry should be whether the government's interests served by any given restriction outweigh the individual deprivations suffered. *Id.* at 564, 99 S.Ct. at 1887 (Marshall, Justice, dissenting). The more specific test for determining whether conditions of pretrial detention violate due process is whether conditions amount to punishment. *Lynch v. Baxley,* 744 F.2d 1452 (11th Cir. 1984).

I would construe confinement pursuant to Section 31–9–1.5 as pretrial detention primarily for remedial purposes rather than punishment, on the basis that the Legislature intended to create an alternative to civil commitment under the MHDDC to serve compelling state interests in protecting the community and in providing for the appropriate disposition of a criminal charge. *Cf. Post,* 541 N.W.2d at 122 (sustaining Wisconsin's statute permitting civil commitment of persons convicted of certain sexual offenses and

found to be in need of specialized treatment following service of their prison sentences).

Because it would be unconstitutional to try an incompetent defendant, *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966), a court must have the power to order a competency hearing and to commit the defendant to an appropriate facility for treatment. The treatment should aid the defendant in becoming competent, and the release standards should be interpreted in light of the pending trial. *See generally Pernell*, 92 N.M. at 499, 590 P.2d at 647. Because Lopez has been additionally found to be dangerous to himself and others, the State has a particular, compelling interest in his detention in a secure, locked facility. *United States v. Salerno*, 481 U.S. 739, 755, 107 S.Ct. 2095, 2105, 95 L.Ed.2d 697 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."); *Jones v. United States*, 463 U.S. 354, 361, 103 S.Ct. 3043, 3048, 77 L.Ed.2d 694 (1983). When it becomes clear that a defendant may not attain competency within a reasonable period, the district court conducts a hearing under Section 31–9–1.5 to determine whether further confinement is appropriate. While Lopez may be legitimately confined and subjected to the conditions and restrictions inherent in such confinement, these restrictions must not amount to punishment, *Bell*, 441 U.S. at 537, 99 S.Ct. at 1873 but must be analyzed in terms of the legitimate policies and goals of the LVMC–FTU. Without opportunities for proper treatment and rehabilitation to curtail dangerousness, it is highly unlikely that individuals such as Lopez will improve to the point where release from the LVMC–FTU will be possible. Not to provide treatment when it could significantly reduce a defendant's need for restraints or the likelihood of violence "may well be unreasonable." *Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S.Ct. 2452, 2462–63, 73 L.Ed.2d 28 (1982). Defendants held pursuant to Section 31–9–1.5 face a potential commitment for a period of time equalling their sentence had they been convicted of the crime as charged. Since Lopez may be subject to a life sentence for the crime charged, he may potentially be held for life unless he attains competency.

Such incarceration is exactly the type of permanent incarceration before adjudication of guilt that was vehemently denounced by the United States Supreme Court in *Jackson*, as an individual may not be deprived of his liberty and stigmatized by confinement unless all elements of the case against him have been proved beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

I conclude that the question of whether the conditions of confinement after a Section 31–9–1.5 hearing amount to punishment depends on the treatment that is available under the statute, either as written or as we may construe it to accomplish the Legislature's purposes. *See Post*, 541 N.W.2d at 124. I also think that unless treatment is a goal, then the state's interest cannot be said to outweigh that of the defendant's. I would construe the statute to provide adequate treatment during the post-Section 31–9–1.5 hearing period. During such a commitment, as a matter of substantive due process, those involuntarily committed under Section 31–9–1.5 have a right to be treated not only for competency, but to alleviate their dangerousness and accompanying mental illness or disability. *Cf. In re Valdez*, 88 N.M. 338, 343, 540 P.2d 818, 823 (1975) (mental illness is not a crime and mentally ill patients, involuntarily committed, must be afforded effective treatment since their liberty is abridged).

Various acceptable forms of treatment may rise above the constitutional threshold, but minimal constitutional standards require treatment to counter dangerousness in order to facilitate defendants' release from a criminal involuntary commitment and into the potential advantages of a civil commitment. *See Eckerhart*, 475 F.Supp. at 914; *In re J.S.*, 124 Wash.2d 689, 880 P.2d 976 (1994). The state has constitutional obligations to adequately care for and treat involuntarily-committed individuals. I agree with Amici that Section 31–9–1.5 appears to permit indefinite commitment without treatment whenever defendants will not likely attain competency to stand trial. As applied to Lopez, it would commit him to a life sentence in a "secure, locked facility," without proof of his guilt beyond a reasonable doubt in the

course of a trial in which he was compelled to participate. Therefore, in accord with the purposes behind Section 31–9–1.5 of facilitating the proper disposition of a criminal trial, I would construe Section 31–9–1.5 as requiring treating incompetent defendants to become competent to stand trial, including treatment for dangerousness, in order to afford them an opportunity to utilize the statute's release provisions. To hold otherwise would certainly "transform the hospital into a penitentiary where one could be held indefinitely for no convicted offense." *Ragsdale v. Overholser*, 281 F.2d 943, 950 (D.C.Cir.1960) (Fahy, Circuit Judge, concurring).

RANSOM, J., concurs.