8 P.3d 863

2000-NMCA-072

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Charlie TAYLOR, Defendant–Appellant.**

**No. 20,686.**

Court of Appeals of New Mexico.

May 16, 2000.

Certiorari Granted, No. 26,432, Aug. 8, 2000.

Patricia A. Madrid, Attorney General, M. Victoria Wilson, Assistant Attorney General, Santa Fe, for Appellee.

Hollis Ann Whitson, Mental Health Unit Coordinator, Sara K. Singhas, Assistant Public Defender, Santa Fe, for Appellant.

## OPINION

BOSSON, J.

{1} Charlie Taylor (Defendant) appeals the district court's determination that he committed first degree murder, resulting in his confinement in a secure, locked facility for his natural life under the New Mexico Mental Illness and Competency Code (the Code). *See* NMSA 1978, §§ 31–9–1 to –1.5 (1993). Defendant argues that the State failed to produce sufficient evidence to support a finding of first degree murder. His argument proceeds along three fronts: (1) the State's evidence was insufficient under a clear and convincing standard to support the district court's finding of a deliberate murder; (2) *State v. Rotherham*, 1996–NMSC–048, 122 N.M. 246, 263, 923 P.2d 1131, 1148, precludes the district court from considering any state of mind evidence regarding an incompetent defendant, making it legally impossible to prove the specific intent required for first degree murder; and (3) the victim's provoca-

tion lowered the culpability for the killing from murder to voluntary manslaughter. We reverse the district court on the sufficiency of the evidence to support first degree murder, but affirm on the remaining issues.

**BACKGROUND**

{2} Defendant stipulated that he shot his wife Rhonda on April 28, 1996, and that the shooting caused her death. Police arrested Defendant the next day. Within a week of his arrest, after filing a criminal complaint charging Defendant with an open count of murder, the district attorney filed a petition with the district court to determine Defendant's competency to stand trial. *See* § 31–9–1 (determination of competency; raising the issue). Defendant was taken to Las Vegas Medical Center's Forensic Unit (Medical Center) for evaluation, after which Defendant was determined not competent to stand trial. The parties stipulated that Defendant was dangerous and waived his rights to hearings under the Code, §§ 31–9–1.2 to –1.3, to determine his prospects of gaining competency within a year. The parties also agreed that Defendant would continue his confinement at the Medical Center for further treatment to address his competency and dangerousness. When the State realized that Defendant would not gain competency to stand trial within one year of the original finding of incompetency, it petitioned the district court for a hearing to determine the sufficiency of the evidence concerning the open charge of murder against Defendant, which the court granted. *See* §§ 31–9–1.4(A), –1.5 (hereinafter "Section 1.5 hearing").

{3} At the Section 1.5 hearing, the details of the killing were reconstructed through the testimony of the medical examiner, the testimony of the law enforcement officers examining the crime scene, and statements Defendant had made to the investigating officers. The State offered all the evidence at the Section 1.5 hearing; Defendant rested his case without producing evidence or testifying. The Section 1.5 hearing yielded the following evidence.

{4} On April 28, 1996, Defendant, his wife Rhonda, and their eighteen-month-old daughter were at home. At some point during the day Rhonda hit their daughter. This behav-

ior was not unprecedented; Rhonda had hit the child on previous occasions. Although, according to the testimony of one of the officers involved in Defendant's arrest, Defendant described Rhonda's behavior as disciplinary, he stated that her manner was abusive and indicated that slapping the "little girl" in the face was inappropriate. Defendant and Rhonda also had argued about the television program she had been watching.

{5} After Rhonda hit the child a third time, Defendant got a gun and shot her. He told the police that when Rhonda abused the child "she had the devil in her eyes," her eyes had fire in them, and that he shot "the devil." Defendant fired six shots, three of which hit Rhonda. One shot grazed the back of her neck, one hit her chest, and another hit her head from short range. The medical examiner testified that either of the latter shots could have caused Rhonda's death. The three other shots included two that were lodged in the structure of the mobile home, and one that was a "targeted hit" on the television.

{6} After the shooting, Defendant drove with his daughter to the foothills of Cooke's Peak north of Deming. Defendant eventually stopped his car, then wandered across the desert on foot with his daughter. Sometime during the night Defendant thought he smelled something burning, began to look for Rhonda, became confused, then lost his daughter. The next day, having abandoned his daughter in the desert, Defendant was stopped and arrested by police as he drove on U.S. Highway 180. When questioned about his daughter, Defendant told the police on one occasion that his daughter was "with Rhonda," and on another that she was "with God," yet he also expressed hope that they could find his daughter. Defendant became very emotional when discussing his daughter, but nevertheless assisted the officers in the search for her. A search team found the daughter alive and unharmed the next day.

{7} After the Section 1.5 hearing, the district court, sitting without a jury, found that the State had produced clear and convincing evidence that Defendant committed first degree murder. The court determined that Defendant's killing of Rhonda "was willful

and deliberate." Because the parties had stipulated that Defendant was dangerous, the district court ordered that he be detained by the Department of Health in a secure, locked, facility for the duration of his natural life. *See* § 31–9–1.5(D)(2) (setting the length of confinement to the maximum sentence he could have received in a criminal proceeding).

## DISCUSSION

### The New Mexico Mental Illness and Competency Code

{8} After the United States Supreme Court determined in *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), that it was a violation of due process and equal protection for the state to hold incompetent criminal defendants indefinitely while awaiting restoration of their competency, New Mexico revised the Code in an effort to comply with *Jackson*. *See Rotherham*, 1996–NMSC–048, 122 N.M. at 252–53, 923 P.2d at 1137–38. The Code set up a procedure whereby the district court holds a factual hearing (the Section 1.5 hearing) to determine whether the incompetent defendant is dangerous and has committed a serious crime. If the court determines that the incompetent defendant is dangerous and has committed a serious crime, it criminally commits the defendant in a "secure, locked, facility" for a fixed period of time "equal to the maximum sentence to which the defendant would have been subject had the defendant been convicted in a criminal proceeding," Section 31–9–1.5(D). At the Section 1.5 hearing, the incompetent defendant may not rebut the charge on the grounds of insanity or lack of mental capacity to form criminal intent. A Section 1.5 hearing is not an adjudication of criminal guilt; the hearing is to determine the maximum time the defendant can be committed for the public's protection and treatment. *See State v. Werner*, 110 N.M. 389, 392, 796 P.2d 610, 613 (Ct.App.1990).

{9} When the defendant completes his maximum time of commitment, or in the event he is determined earlier to be no longer dangerous within the meaning of the Code, *see* § 31–9–1.5(D)(4)(b)–(c), the defendant may still be subject to civil commitment under the Mental Health and Developmental Disabilities Code, NMSA 1978, §§ 43–1–1 to –25 (1976, as amended through 1999), if he "presents a likelihood of harm to himself or others," Section 43–1–12(C). If, through treatment, the defendant becomes competent during his commitment, he faces the original criminal charges at a regular criminal trial. *See* § 31–9–1.5(D)(4)(a). Thus, once found to have committed a crime at a Section 1.5 hearing, the defendant will not regain his liberty until either (1) he completes the term of his criminal commitment or is no longer considered dangerous, *and* the State decides that civil commitment is unwarranted, or (2) the defendant's treatment results in competency and the criminal charges are resolved. Although the Code has been repeatedly challenged on various constitutional grounds, it has continually survived constitutional scrutiny. *See Rotherham*, 1996–NMSC–048, 122 N.M. at 264, 923 P.2d at 1149; *State v. Gallegos*, 111 N.M. 110, 117, 802 P.2d 15, 22 (Ct.App.1990); *Werner*, 110 N.M. at 392, 796 P.2d at 613.

### The Effect of *State v. Rotherham*

{10} Defendant presents a question we must resolve before addressing the sufficiency of the evidence: whether the Supreme Court's opinion in *Rotherham* precludes the district court holding a Section 1.5 hearing from considering Defendant's state of mind while committing a criminal act. *Rotherham* viewed the Section 1.5 hearing as a procedure less concerned with a defendant's *mens rea*, and more with whether a "defendant committed the criminal *act*." *Id.*, 1996–NMSC–048, 122 N.M. at 263, 923 P.2d at 1148 (citing *Werner*, 110 N.M. at 391, 796 P.2d at 612). In observing this function of a Section 1.5 hearing, the Court then stated, "Hence, any evidence relating to the defendant's state of mind at the time the criminal act was committed is irrelevant." *Id.* Defendant seizes upon this quote from *Rotherham* as authority that prevents the district court from finding that he committed a specific intent crime because, according to Defendant, that state of mind is now "irrelevant."

{11} Defendant asserts, correctly, that the district court necessarily delved into his mental state by finding that the "killing of Rhonda Taylor was willful and deliberate." Thus,

according to Defendant's reading of *Rotherham*, the district court committed reversible error by making the very mental state determination that is essential to first degree murder. Going to the next logical step, Defendant concludes that under *Rotherham* the most the district court could consider was second degree murder, and perhaps only manslaughter.

{12} We believe Defendant misreads the meaning of *Rotherham*. In that opinion, the Supreme Court expressly relied upon our opinion in *Werner*. *See Rotherham*, 1996–NMSC–048, 122 N.M. at 263, 923 P.2d at 1148. But the holding of *Werner* does not stand for the proposition Defendant urges us to adopt. It states only that a *defendant* cannot present "defenses of insanity and inability to form a specific intent" at the Section 1.5 hearing. *Werner*, 110 N.M. at 392, 796 P.2d at 613. *Werner* says nothing that would minimize the State's burden to prove a specific intent and present evidence accordingly, when it is an essential element of the crime charged.

{13} Seven months after *Werner* was decided, this Court confirmed that while Section 1.5 removes the defense of lack of capacity from consideration, the State nonetheless has the burden of proving the elements of the crime charged, including specific intent. *See Gallegos*, 111 N.M. at 117, 802 P.2d at 22. We observed in *Gallegos* that the defendant was free to contest the specific intent at issue, as was done in that case by putting on evidence that the injury was due to an accident instead of a specific intent to injure. The *Gallegos* opinion stated, "The only thing *Werner* prohibits is defendant attempting to defend on the basis that he lacked capacity to commit the crime or form specific intent." *Id.* We concluded in *Gallegos* that at the Section 1.5 hearing "there was evidence supporting a finding of specific intent to injure" sufficient for aggravated assault. *Id.; see also* NMSA 1978, § 30–3–2(C) (1963) (defining aggravated assault as assault with intent to commit any felony). Read together, *Werner* and *Gallegos* permit *both* parties to offer proof of Defendant's state of mind with only one exception: Defendant may not use lack of mental capacity or insanity to prove lack of specific intent.

{14} Did *Rotherham* alter this balance, such that a specific intent crime can no longer be proved or disproved in a Section 1.5 hearing? We think not. As noted, in *Rotherham* our Supreme Court was affirming, not changing, the law previously articulated in *Werner* and *Gallegos*. There is no indication anywhere in the *Rotherham* opinion that the Court was trying to restate the law or alter the status quo that had already established the irrelevance of mental capacity at a Section 1.5 hearing. Any other conclusion would fly in the face of the ameliorative goals of the Code which include ensuring the long-term commitment and treatment of dangerous, incompetent defendants. *See Werner*, 110 N.M. at 392, 796 P.2d at 613. It follows that, in drafting the Code, our legislature intended to include, not exclude, the most serious crimes involving the most dangerous defendants. We also observe that several of the defendants in the *Rotherham* opinion, like the defendant in *Gallegos*, were facing criminal commitment proceedings for specific intent crimes. *See Rotherham*, 1996–NMSC–048, 122 N.M. at 249–51, 923 P.2d at 1134–36 (first degree murder, arson, attempted kidnaping). Thus, the *Rotherham* opinion would be a strange vessel indeed from which to draw the inference that specific intent has become irrelevant to the Section 1.5 process.

{15} Finally, a fair reading of the language used in *Rotherham*, taken in context, undercuts Defendant's contention. The defendants in *Rotherham* were *not* complaining about the State having to prove state of mind as part of the essential elements of the crime charged. In stating that "any evidence relating to the defendant's state of mind ... is irrelevant," the Court was addressing the due process complaint, held over from *Werner*, that the defendants were being precluded from defending at a Section 1.5 hearing on the basis of their "inability to form specific intent" due to lack of mental capacity. *Rotherham*, 1996–NMSC–048, 122 N.M. at 263, 923 P.2d at 1148. Thus, taken in context, when the Supreme Court characterized "state of mind" as irrelevant, it was using the term as it pertained to the issue before it:

the irrelevancy of the defendant's *ability* to form a specific intent. Simply put, the Court was never asked to address the present question and did not do so.

{16} We acknowledge the anomaly of a mental incompetent defending against a specific intent crime being precluded from showing an incapacity to form that very specific intent. It is, however, part of the balancing process woven into the Code. *See id.* Its justifications are reflected in the purposes for commitment—treatment as opposed to punishment—and in society's need for protection from dangerous persons found to have committed serious criminal acts. *See id.* And, whatever the hardship may be upon the mentally incompetent, we repeat what has been previously said in *Gallegos;* that the accused is free to disprove specific intent by any means short of lack of mental capacity. *See Gallegos,* 111 N.M. at 117, 802 P.2d at 22. Defendant counters that he in effect has been rendered defenseless, that only the State can "present evidence and make argument regarding Mr. Taylor's mental state at the time of the shooting." But Defendant pushes too hard; he is not defenseless nor has he been denied due process of law. As we shall see shortly, the appeal before us illustrates how an incompetent defendant can fend off a specific intent crime, and how the state can fall short in meeting its burden, without any reliance on the defendant's insanity or lack of capacity to form intent.

**Sufficiency of the Evidence**

{17} To prove a specific intent crime, the State, by necessity, has to demonstrate more than an act or action of the accused. The State has to demonstrate that the accused harbored a given intention. In a case of first degree murder, the State has to prove a deliberate intention to kill, which "may be inferred from all of the facts and circumstances of the killing." UJI 14–201 NMRA 2000; *see also State v. Duarte,* 1996–NMCA–038, ¶ 7, 121 N.M. 553, 915 P.2d 309. At a Section 1.5 hearing, the defendant is equally entitled to marshal a factual case that disproves either direct or inferential evidence that he had formed, or had the opportunity

to form, a deliberate intent to kill. *See Gallegos,* 111 N.M. at 117, 802 P.2d at 22; *see also State v. Motes,* 118 N.M. 727, 729, 885 P.2d 648, 650 (1994) (finding that deliberate murder requires proof of opportunity to deliberate and actual deliberation).

{18} Defendant asserts that the State failed to offer sufficient evidence of deliberation to support a first degree murder finding. We review Defendant's sufficiency of the evidence argument to ensure that "substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty ... with respect to every element essential to a conviction." *State v. Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). In reviewing the evidence, an appellate court views the ruling in the light most favorable to the prevailing party, resolving all conflicts and permissible inferences in its favor. *See Motes,* 118 N.M. at 729, 885 P.2d at 650. Nevertheless, the review requires scrutiny of the evidence and supervision of the fact-finding process to determine whether any rational fact finder could determine that the evidence presented meets the relevant burden of proof. *See State v. Garcia,* 114 N.M. 269, 274, 837 P.2d 862, 867 (1992); *accord In re R.W.,* 108 N.M. 332, 336, 772 P.2d 366, 370 (Ct.App.1989). For Section 1.5 hearings, the burden of proof the State must meet is clear and convincing evidence of the crime. *See* § 31–9–1.5(D).

{19} To find deliberate, first degree murder, the district court was required to determine that Defendant intended to kill Rhonda "as a result of careful thought; that he weighed the considerations for and against his proposed course of action; and that he weighed and considered the question of killing and his reasons for and against this choice." *Garcia,* 114 N.M. at 274, 837 P.2d at 867. The language of *Garcia* tracks our uniform jury instruction for deliberate murder. *See* UJI 14–201. The instruction distinguishes a deliberate intention from a rash impulse and states that a "mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill." *Id.*

{20} Our review of the evidence reveals that the State's case is skeletal, and the

events surrounding the shooting are vague. Because the witnesses who testified were not at the scene, and Defendant did not testify, our knowledge of the circumstances is limited. The State even concedes that the most basic questions, such as the timing of events and the order in which the shots were fired, are unanswerable.

{21} We do know that Defendant admitted shooting his wife. We also know that he did so because he believed she was possessed by the devil. In its memorandum opinion, the district court acknowledged Defendant's confusion between Rhonda and the devil. In describing how he lost his daughter, Defendant's confusion resurfaced. He told the police that "he was wandering in the desert looking for his wife Rhonda," despite having already shot her in their home. Further, Defendant told police that his daughter was with Rhonda, and on another occasion, with God. These judicial findings put into question Defendant's state of mind at the time of the shooting, and they raise grave doubts about whether Defendant's killing of Rhonda was "[the] result of careful thought." UJI 14–201.

{22} The strongest evidence supporting the district court's finding of first degree murder was Defendant's admission to the police that he armed himself with a hand gun and shot Rhonda after she hit their daughter the third time. Although the retrieval of weapon could have given Defendant the opportunity to deliberate about killing Rhonda, there is no evidence from which we can permissibly infer that Defendant actually did so. We have no statements before the shooting that he wanted to kill Rhonda or wished her dead. *See State v. Cunningham,* 2000–NMSC–009, ¶ 4, 128 N.M. 711, 998 P.2d 176; *State v. Apodaca,* 118 N.M. 762, 767, 887 P.2d 756, 761 (1994). There is no evidence of a carefully crafted plan to kill, *see State v. Gonzales,* 1999–NMSC–033, ¶ 10, 128 N.M. 44, 989 P.2d 419 (finding murder for hire); *Motes,* 118 N.M. at 729–30, 885 P.2d at 650–51 (rendering victim unconscious while she was asleep, then burying her alive), or of Defendant's hot pursuit of the victim, *see Cunningham,* 2000–NMSC–009, ¶ 27, 128 N.M. 711, 998 P.2d 176; *State v. Salazar,*

1997–NMSC–044, ¶ 46, 123 N.M. 778, 945 P.2d 996; *State v. Blea,* 101 N.M. 323, 325, 681 P.2d 1100, 1102 (1984), or a manner of death requiring an extended time to complete, such as strangling and suffocating the victim, *see State v. Rojo,* 1999–NMSC–001, ¶ 24, 126 N.M. 438, 971 P.2d 829. Defendant's rote recitation of what happened, even his admission that he killed his wife, provided no details of reflection or contemplation before the killing, as required of first degree murder convictions. *See Garcia,* 114 N.M. at 275, 837 P.2d at 868 (finding that defendant's statement after a killing that—"I told my brother I did him and I'd do him again"—was insufficient to infer deliberation before the killing); *see also State v. Hernandez,* 1998–NMCA–167, ¶¶ 2–8, 13, 126 N.M. 377, 970 P.2d 149 (finding evidence insufficient to support attempted first degree murder conviction arising from an attempted escape from custody, during which the defendant engaged in a prolonged struggle with an officer for a gun, fired the gun, and exclaimed, "I'll kill you"). The evidence here does not place the shooting in a class with the "most heinous and reprehensible" of murders, such as lying in wait for the victim, which deserve the most severe punishment available under state law. *See Garcia,* 114 N.M. at 272, 837 P.2d at 865.

{23} In holding that the evidence does not rise to the level of deliberate, first degree murder, we acknowledge that in a Section 1.5 hearing the State need only satisfy a clear and convincing standard of proof. This is in contrast to the requirement of proof beyond a reasonable doubt in criminal prosecutions, including those discussed above. Nonetheless, the State offers as evidence of deliberation only an inference that Defendant may have considered Rhonda's killing in the time available to retrieve the weapon. At best, given Defendant's confused state, it is equally plausible that this inferred "careful thought" never took place. We are left to speculate. In neither case, even when viewed in the light most favorable to the State, is there clear and convincing evidence sufficient to "instantly tilt the scales in the affirmative." *In re Sedillo,* 84 N.M. 10, 12, 498 P.2d 1353, 1355 (1972). As pointed out in *Garcia,* 114 N.M. at 275, 837 P.2d at 868,

"evidence equally consistent with two inferences does not, without more, provide a basis for adopting either one." *See also State v. Benton,* 118 N.M. 614, 615–16, 884 P.2d 505, 506–07 (Ct.App.1994) (holding that the rule requiring appellate courts to indulge in all reasonable inferences supporting the district court's ruling does not permit speculation).

{24} The absence of evidence in regard to Defendant's deliberation is evident throughout the record. The debate at the Section 1.5 hearing centered not on first degree murder, but on the distinction between second and third degree murder. During the discussion of provocation, the State admitted, "Perhaps it was a rash impulse, and the State would recognize that." Later, the State argued in favor of second degree murder, "Why shoot the TV? ... It seems like he made a rash, impulsive decision at the very least." The State never argued that Defendant actually deliberated before killing Rhonda, which led to the court's *sua sponte* request for argument on depraved mind murder, proclaiming that it was "having a problem with premeditation at this point."

{25} On appeal, the State also argues that the court's conclusion can be justified under the alternative theory of depraved mind murder. The State suggests that the court "carefully considered" the application of depraved mind murder, and therefore it must have included it within the final order that held, without specificity, that Defendant committed first degree murder. Based on our review of the record, we do not agree. The district court issued findings of fact and conclusions of law in a memorandum opinion, which were adopted in the final order. These conclusions of law specifically state that the killing was "willful and deliberate"; they do not state that the shooting was a depraved mind murder. Nowhere in the memorandum opinion does the district court make findings of fact necessary to support a depraved mind murder ruling. Although a theory of depraved mind murder was thoroughly considered by the district court, its absence from the findings and conclusions implies, if anything, that the theory was abandoned, not adopted, by the district court.

{26} The State would have us treat the district court's final order as if it were the general verdict of a jury. *See Salazar,* 1997–NMSC–044, ¶ 32, 123 N.M. 778, 945 P.2d 996. The State argues that because the final order holds only that Defendant committed first degree murder, without designating any specific theory, then any theory not expressly eliminated should be considered by this Court in an effort to uphold the trial court's ruling. This argument ignores the different roles the judge and jury play in the fact-finding process. Whereas the jury may return a general verdict without specification, *see* Rule 5–609(B) NMRA 2000; Rule 5–611(A) NMRA 2000, a judge sitting without a jury does just the opposite by filing written findings of fact and conclusions of law that specify the factual and legal support for the result reached, *see* Rule 5–605(D) NMRA 2000; Rule 1–052(B)(1) NMRA 2000. We cannot read into findings and conclusions what is not there. For the foregoing reasons, the court's finding of first degree murder is not supported by sufficient evidence in the record and must be reversed.

**Provocation**

{27} Defendant additionally argues that Rhonda provoked him by hitting their child, and that this provocation lowered the degree of crime from second degree murder to voluntary manslaughter. Defendant contends that once he "comes forth with evidence of provocation, the burden is on the State to show that the defendant did not act as a result of sufficient provocation." To place the burden upon the State to disprove provocation, however, Defendant must demonstrate legally sufficient provocation, which is "sufficient evidence that the provocation was such as to cause a temporary loss of self control in an ordinary person of average disposition." *State v. Manus,* 93 N.M. 95, 99, 597 P.2d 280, 284 (1979), *overruled on other grounds by Sells v. State,* 98 N.M. 786, 788, 653 P.2d 162, 164 (1982). By definition, provocation includes an objective component, and Defendant must demonstrate that his "anger, rage, fear, sudden resentment, terror or other extreme emotions ... would affect the ability to reason" in an ordinary person. UJI 14–222 NMRA 2000. The question of

provocation is not solely a subjective one. *See State v. Stills,* 1998–NMSC–009, ¶¶ 36–37, 125 N.M. 66, 957 P.2d 51 (holding that trial judge must determine whether an ordinary person in the situation would have been provoked).

{28} Assuming, without deciding, that Defendant came forward with enough evidence to meet his burden of production on the issue of sufficient provocation, the State was entitled to attack the sufficiency of this evidence, which it did. The question of whether the circumstances rose to the level of provocation to reduce second degree murder to voluntary manslaughter was for the fact finder to resolve, here the district court judge. *See Sells,* 98 N.M. at 788, 653 P.2d at 164. The district court's decision against Defendant based upon the efficacy of the State's argument is not grounds for reversal.

{29} To support his argument for voluntary manslaughter, Defendant directs this Court to authorities that reverse convictions for failure to offer the jury correct voluntary manslaughter instructions. *See, e.g., State v. Benavidez,* 94 N.M. 706, 708, 616 P.2d 419, 421 (1980), *overruled on other grounds by Sells,* 98 N.M. at 788, 653 P.2d at 164; *Commonwealth v. Berry,* 461 Pa. 233, 336 A.2d 262, 264–65 (1975). These cases do not stand for the proposition that a particular fact pattern is voluntary manslaughter as a matter of law. As noted in our precedent, the application of the provocation defense turns on the specific facts of the individual case. *See Sells,* 98 N.M. at 788, 653 P.2d at

164. Defendant was given ample opportunity to present his theory of provocation to the district court, complete with findings of fact and conclusions of law, which the court refused to adopt. Without demonstrating that the district court applied an incorrect standard, we decline Defendant's invitation to hold that a mother disciplining her child, even with a slap to the child's face, is sufficient provocation as a matter of law to reduce a charge of second degree murder to voluntary manslaughter.

## CONCLUSION

{30} For the reasons stated, we reverse the district court's determination that Defendant committed willful and deliberate first degree murder, but we affirm the determination that there was insufficient provocation for voluntary manslaughter. We remand this case to the district court, directing it to enter a finding pursuant to Section 1.5 that Defendant committed second degree murder for the shooting of Rhonda Taylor.

{31} **IT IS SO ORDERED.**

BUSTAMANTE and KENNEDY, JJ., concur.