This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date:  November 17, 2016**

**STATE OF NEW MEXICO,**

    Plaintiff-Petitioner,

v.                                                                    NO.  S-1-SC-35259

**ANTHONY JOHN MORRIS,**

    Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Stanley Whitaker, District Judge**

Hector Balderas, Attorney General
John Kloss, Assistant Attorney General
Santa Fe, NM

for Petitioner

Jorge A. Alvarado, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Respondent

**DECISION**

**MAES, Justice.**

{1}     Anthony John Morris (Defendant) was convicted of the willful and deliberate first-degree murder of Mary DuPris (DuPris) on December 26, 1991. Defendant was sentenced to a term of life imprisonment. In his direct appeal to this Court, Defendant challenges the sufficiency of the evidence.

{2}     This Court exercises appellate jurisdiction where life imprisonment has been imposed. *See* N.M. Const. art. VI, § 2; *see also* Rule 12-102(A)(1) NMRA (2000). We affirm Defendant's conviction and sentence. Because Defendant raises no questions of law that New Mexico precedent does not already sufficiently address, we issue this nonprecedential decision pursuant to Rule 12-405(B)(1) NMRA.

 **BACKGROUND**

{3}     In December of 1991, DuPris lived in Acomita, New Mexico with her two children Trevor and Angelina. She also lived with her mother, Marlene Bear Stops (Marlene), sister Rochelle Lovato (Rochelle), and older brother Wilfred Antonio, Jr. (Wilfred). DuPris spent Christmas Eve and Christmas Day of 1991 with her family in Acomita, celebrating the holiday.

{4}     The next morning, December 26, 1991, Marlene drove to Albuquerque with her

2

daughters, DuPris and Rochelle; her grandchildren, Trevor and Angelina; and Rochelle's friend Claudine. They stopped to drop Marlene at the Western Bank building in Albuquerque, where she worked at the U.S. Public Health Service. After Marlene left, DuPris drove the group around town, stopping at a plasma donation center to make a donation, the Coronado mall, and a local park to play with her kids. Over the course of the day DuPris purchased wine coolers and beer.

{5} At around 4:30 p.m., DuPris returned to pick her mother up from work. Marlene suggested that she drive, as DuPris had been drinking. DuPris agreed and exited the vehicle, but then decided to stay in Albuquerque for the night telling the group that she would probably stay at her aunt's house. She asked her mother and sister to take care of her children and then walked away from her family.

{6} Later that day, Donja Kaye Nations, the manager of a motel at 1020 Central Avenue SW in Albuquerque, saw a woman matching a description of DuPris walking down Central. As the woman walked, a red truck pulled up next to her and stopped just in front of her. A man jumped out of the truck, picked up the woman, forced her into the passenger seat of the truck, and drove away. At trial, Ms. Nations testified that the woman had a "terrified look on her face" and it "didn't seem like she knew him at all." After discussing what she had seen with her husband, Nations decided

3

not to call the police, and instead waited three months to report what she had seen to the police. At trial, Nations testified that she would "probably never forget [the] face" of the woman she had seen abducted, and Nations was "pretty sure" that woman was DuPris. Nations also testified that she believed the truck was a Dodge but could not be sure.

{7} That same day, Victor Zabel, Sr. was working at the Double Eagle II Airport on Paseo del Volcan on the west side of Albuquerque with his son, Victor Zabel, Jr. That evening Zabel, Jr. left the airport before his father. On his way home, while on Paseo del Volcan near I-40, he passed a red truck that was stopped on the east side of the road closer to I-40, but did not see anything else out of the ordinary.

{8} Zabel, Sr. left the airport about fifteen minutes after his son. When he was about one mile north of I-40, he saw something lying in the road and swerved in an unsuccessful attempt to avoid hitting it. At first he thought it was a tire, and continued driving, but then looked back to see what he had hit, and realized that it was a person. Unsure of how to proceed, he drove to a nearby gas station and called the police at approximately 6:58 p.m. He then returned to the body to prevent anyone else from hitting it, checked the body for a pulse, but found none. Officers arrived on scene at approximately 7:18 p.m.

4

{9} Officers responding to the scene originally believed DuPris' death to have been caused by a motor vehicle accident. The following day, Dr. Kurt Nolte, Chief Medical Investigator, supervised the autopsy performed on the body which he positively identified as DuPris. During the initial examination, Dr. Nolte noted the presence of a gunshot wound on the right temple, which had a downward trajectory moving from right to left. Dr. Nolte testified that there was no evidence of gunpowder residue around the wound, but that there were punctate abrasions around the wound, which suggested that the gunshot traveled through an intermediate target from an indeterminate distance. Dr. Nolte noted numerous other injuries on DuPris' body, and categorized these injuries as "blunt force trauma" consistent with those sustained by being run over with a motor vehicle. However, the cause of death was determined to be the gunshot wound to the temple. Samples from DuPris' body were collected for analysis, including oral, vaginal, and rectal swabs.

{10} A homicide investigation ensued. However, after months of investigation, the case remained unsolved and went cold. In 2011, the case was reopened with Detective Sally Dyer assigned as case agent. Dyer reviewed the file and reinterviewed witnesses. DNA analysis, using technology that was more advanced than had previously been available, was already underway at the state crime lab when

Dyer became case agent. The testing was conducted to determine if a match could be made with any of the three men who had been suspects in the initial investigation, specifically Jared Younger, Calvin Winfield, and Harry Ray. Calvin Winfield had been a suspect in a different murder, of a woman killed with a 9 millimeter handgun less than a mile from where DuPris was found. The 9 millimeter used by Winfield to murder the woman, and commit suicide, was tested against the bullet recovered from DuPris, but the results were inconclusive.

{11}    On February 24, 2012, Dyer was informed that one of the swabs taken from DuPris' body had returned a match to Defendant. Based on the database match, she obtained a search warrant for a DNA sample from Defendant, and conducted an interview with him. Dyer testified that she obtained the search warrant in order to confirm the DNA match.

{12}    At his interview, Defendant gave a DNA sample via a buccal swab of his mouth. When asked about what he was doing in 1991, he told detectives that he had a habit of frequenting prostitutes. Defendant explained that he would "sometime[s], you know, if I'm on the way up, and somebody's hitchhiking, I'll see her out there, you know – yeah, I'll pull over and talk to them. You know, if it ended up that way, that's the way it ended up . . . ." When asked if he had ever had contact with DuPris,

6

Defendant replied, "[n]ot that I know of," which Defendant explained to mean that he could not remember. Defendant also replied "[n]ot that I know of" when asked if he paid for rough sex, and he explained that his "sex . . . sometimes, it gets a little funky." When pressed by Detectives, he could not explain how his DNA was present on DuPris, stating "[t]hat's something for you people to find out how."

{13} After the interview, Detective Dyer requested records of phone conversations made by Defendant to his ex-wife from the correctional facility where he was housed. In one call, made after his interview with detectives, Defendant told his ex-wife that "[t]hey can't get me on it, not first-degree murder, if they get me on anything." In another call, Defendant instructed his ex-wife to "junk" his red Dodge pickup truck that he had owned in 1991.

{14} Based on the conversations between Defendant and his ex-wife, investigators obtained a search warrant for the vehicle and seized it for examination. Investigators checked the vehicle for "trace elements" such as blood, DNA, and fibers. Using a chemical called "luminal" investigators found the presence of blood on the front bench seat of the truck and in the truck's bed. Testimony from Eve Tokumaru, a forensic scientist at the New Mexico Department of Public Safety, confirmed that the front bench seat had blood on it, and that the blood was human. However, due to the

age of the sample, Tokumaru was only able to create a partial DNA profile, which was not sufficient to identify the source of the blood.

{15} The DNA sample taken from Defendant was analyzed and compared to the DNA profile compiled from the swab taken from DuPris' body. Annette Ortiz, a forensic scientist at the State Crime Lab, testified that a comparison of the two DNA samples could not eliminate Defendant as a source of the DNA found on an oral swab sperm palate taken from DuPris' mouth. Catherine Dickey, a forensic scientist with the Albuquerque Police Department, testified that sperm cells can generally be detected on an oral swab between two and six hours after being deposited, noting that only one study had found sperm cells up to 24 hours after deposit.

{16} On March 26, 2015, Defendant was found guilty of first-degree murder and sentenced to life imprisonment. In his appeal, Defendant challenges his conviction on two grounds. First, he contends that the State failed to present sufficient evidence that he murdered DuPris. Second, he argues that the State failed to present sufficient evidence of his deliberative intent to end her life.

**STANDARD OF REVIEW**

{17} When reviewing for substantial evidence, we determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt

8

beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Astorga*, 2015-NMSC-007, ¶ 57, 343 P.3d 1245 (quoting *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314).  We "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Astorga*, 2015-NMSC-007, ¶ 57.  "This [C]ourt does not weigh the evidence and [does] not substitute its judgment for that of the fact finder so long as there is sufficient evidence to support the verdict." *Sutphin*, 1988-NMSC-031, ¶ 21.  Therefore, when there is substantial evidence to support the conviction, the verdict will not be disturbed on appeal. *Id*.

**DISCUSSION**

{18}    First-degree murder consists of "the killing of one human being by another without lawful justification . . . (1) by any kind of willful, deliberate and premeditated killing."  NMSA 1978, § 30-2-1(A)(1) (1994).  The jury was instructed that:

> For a conviction of willful and deliberate murder, the State must prove beyond a reasonable doubt that:
>     1.  Defendant killed DuPris;
>     2.  The killing was with the deliberate intention to take away the life of DuPris;
>     3.  This happened in New Mexico on or about the 26th day of December, 1991.

9

{19}    As to Defendant's first argument, he argues that the purely circumstantial evidence presented was not sufficient to support the jury's finding of guilty beyond a reasonable doubt.  Specifically, Defendant points to the lack of evidence that he owned, had access to, or had ever used a 9 millimeter handgun; that there was another person suspected of factually indistinguishable crimes that the police ruled out; and that the gun believed to have been used in those other crimes was not ruled out as the murder weapon in this homicide.  These facts, Defendant argues, demonstrate that the evidence, even when viewed in a light most favorable to the verdict, does not support the jury's finding that he was the man who killed DuPris.  The State, in response, contends that the physical evidence of Defendant's sperm, his statements to the police, and the discovery of human blood in his truck supported the jury's verdict.

{20}    In *State v. Montoya*, 2015-NMSC-010, 345 P.3d 1056, we held that, "[c]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts." *Id.* ¶ 52. Further, "[w]e do not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence, and we do not weigh the evidence or substitute our judgment for that of the fact finder so long as there is sufficient evidence to support the verdict." *Id.* (internal quotations omitted.)

10

{21} The evidence presented at trial proved that Defendant lived about five miles from where DuPris' body was found, that he frequented prostitutes on Central Avenue, that he owned a red pickup, and that he attempted to dispose of his truck before police seized it. It is also clear from the evidence that Defendant's sperm was present on oral swabs taken from DuPris' body, and that human blood was found on the front seat of Defendant's truck.

{22} Accordingly, we hold that the jury was presented with sufficient evidence to support its finding that Defendant killed DuPris beyond a reasonable doubt. Additionally, when considering the totality of the evidence presented linking Defendant to the crime, the jury was free to disregard Defendant's argument that another suspect had murdered DuPris, notwithstanding the questions left unanswered about the murder weapon.

{23} As to Defendant's second argument, he contends that the State failed to present sufficient evidence that, if he indeed killed DuPris, he did so with deliberate intention to end her life. Specifically, he argues that no testimony or evidence was presented that he "weighed the considerations for and against his proposed course of action; and that he weighed and considered the question of killing and his reasons for and against his choice." *See State v. Taylor*, 2000-NMCA-072, ¶ 19, 129 N.M. 376, 8 P.3d 863.

11

The State contends that the evidence of DuPris' abduction, the fatal gunshot wound to her head, and the presence of Defendant's sperm on DuPris' body supported the jury's finding of guilt.

{24}     The jury was instructed that:

> A deliberate intention refers to the state of mind of the defendant.  A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time.  A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

We have held that "[d]eliberate intent may be inferred from the particular circumstances of the killing as proved by the State through the presentation of physical evidence." *State v. Duran*, 2006-NMSC-035, ¶ 8, 140 N.M. 94, 140 P.3d 515.  Further, "[i]ntent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." *Id.*  ¶ 7 (citations omitted). *See also State v. Guerra*, 2012-NMSC-027, ¶ 28, 284 P.3d 1076 ("In determining whether a defendant made a calculated judgment to kill, the jury may infer intent from circumstantial evidence; direct evidence of a defendant's state of mind is not

12

required.").

{25}    The evidence presented at trial demonstrates that Defendant had a pattern of frequenting prostitutes, that he abducted DuPris and that she did not go willingly, that his sperm was found in DuPris' mouth, and that the cause of death was a single gunshot wound to the right temple of DuPris' head. A reasonable jury could infer from these facts, the surrounding circumstances of DuPris' abduction, and the location where the body was found that Defendant engaged in a calculated series of acts designed to abduct, rape, and kill DuPris. Additionally, a reasonable jury could infer that after Defendant forced DuPris to engage in intercourse, and before shooting her in the head, he weighed the consequences of his course of action, and considered the question of killing DuPris.  Accordingly, we hold that there was sufficient evidence to support the jury's verdict that Defendant killed DuPris with the deliberate intent to end her life.

**CONCLUSION**

{26}    There was sufficient  evidence both that Defendant killed DuPris and that he did so with a deliberate intent.  Accordingly, Defendant's conviction is affirmed.

{27}    **IT IS SO ORDERED.**

_____
                              **PETRA JIMENEZ MAES, Justice**

13

**WE CONCUR:**

_____
**CHARLES DANIELS, Chief Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**BARBARA J. VIGIL, Justice**

_____
**JUDITH NAKAMURA, Justice**

14